# COURT OF APPEALS

OF

## NORTH CAROLINA

AT

## RALEIGH

STATE OF NORTH CAROLINA v. JOHNNY JOSEPH HEAD

No. 8522SC761

(Filed 4 February 1986)

1. **Homicide § 1; Criminal Law § 32—** second degree murder—body not found—proof of corpus delicti sufficient

   The trial court did not err in a prosecution for second degree murder by denying defendant's motion to dismiss for insufficient evidence where the State met its burden of establishing the *corpus delicti*, despite the lack of a body, in that there was no apparent motive for the victim to disappear; there was much evidence tending to show strong motives for her to continue enjoying the life she was leading; there was nothing missing from her home such as clothing or a suitcase; all of the clothing she had been wearing when last seen was found except a sweater or blouse; the last transactions on her joint bank account with her husband were a credit card payment in excess of $800 and a deposit in excess of $1,800; the victim was shown to be a happy person, in good physical and mental condition; she was described as very conscientious and hardworking; she had had several real estate closings planned for that week and she had made plans to get back in touch with clients; she had made tentative plans to host an open house later that month; although the victim and her husband had separated in the past, they had reconciled and there was no evidence of continuing acrimony or ill feelings in the relationship; the victim had never previously disappeared or left home for any length of time; a police survey of thirteen hospitals and mental health centers failed to turn up any patients matching the victim's name or description; and there was no evidence that she was alive at the time of trial, nineteen months after her disappearance.

2. **Homicide §1; Criminal Law § 32—** second degree murder—body not found—evidence of criminal agency sufficient

   There was sufficient evidence in a prosecution for second degree murder to allow the reasonable inference that the cause of the victim's death was a criminal agency where no body or other physical remains were found indicat-

1

ing suicide or natural causes; had the victim died by accident, the presence of most of her clothing would admit of no explanation; circular pieces of duct tape found in the same general area as the clothes fit together where they had been cut once to form ankle-size loops for binding; pieces of hosiery material and fibers from the victim's shoes and polyester slacks were found on the duct tape; the slacks and underwear were cut and torn or cut further to lay the fabric back totally; a hair microscopically consistent with that of the victim was found on a nylon rope; hairs matching the victim's on the slacks and one of her shoes were crushed and had tissue adhering to the roots, indicating forcible removal; and the victim had been scheduled to appraise the house of a man who had given her a false name and false telephone number.

3. **Homicide § 21.4— second degree murder—evidence that defendant was the criminal agent responsible for death—sufficient**

The evidence was sufficient in a prosecution for second degree murder to show that the criminal agent who caused the victim's death was defendant where fingerprint evidence linked defendant to a trash bag and its contents; hair strands linked duct tape, rope, shoes, slacks, and other items to the victim; fiber evidence linked both defendant and the victim to the trash bag's contents and clothing found in the woods and showed convincingly that the victim had been in defendant's home; in her notes and to other people, the victim had made at least four references to "McCorkle" or "Larry McCorkle" in connection with an appraisal of a house or directions which led to defendant's house; defendant had previously been heard to represent himself as McCorkle; defendant did not appear at work on the day the victim disappeared; three long distance calls were made from defendant's residence to the victim's office that day; items found to match similar objects in defendant's residence included a trash bag, duct tape, a sexually oriented pinup from a magazine, strapping tape on the pinup, and bath cloths; a motive could be inferred from the evidence of duct tape bindings, panties and slacks that were cut or torn open to expose the genital area, and the presence of several sexually-oriented magazines in the trash bag; and inconsistencies in the State's evidence regarding the date on a sheet containing appraisal information about defendant's residence and the location of the property the victim was going to appraise the day she disappeared was explained at trial.

4. **Criminal Law § 73.1— admission of hearsay—telephone conversation— harmless error**

There was no prejudicial error in a prosecution for second degree murder where the court allowed a detective to testify that she had called thirteen hospitals in North Carolina regarding anyone matching the description of the missing victim and was advised that they had not treated the victim. There is no reasonable possibility that the result of the trial could have been different if the answer had been struck because the detective had already testified that she had checked thirteen hospitals and the fact that defendant was being tried for murder and that the victim was still missing gave rise to the clear inference that the victim was not located during the detective's search. N.C.G.S. 15A-1943 (1983), N.C.G.S. 8C-1, Rules 902 and 901(c).

State v. Head

5. **Criminal Law § 38— second degree murder of realtor—testimony from another realtor that defendant's house eerie—no error**

The trial court did not err in a second degree murder prosecution by refusing to strike the testimony of a realtor who had gotten a call from a "Mr. E. J. Head" who wanted his property appraised; the realtor had gone to defendant's house, arriving about ten minutes early; a dog on the porch was the only sign of life; the windows were closed and the drapes pulled; she had not knocked, but had left a card saying she would call later; two male voices answered a later call to "Mr. Head" at defendant's residence; the first voice identified the second as the father and denied having called the realtor to appraise the house; and the realtor testified on redirect that she had not liked the looks of the house because it was unknown and she felt that she was being watched. The testimony was relevant to show by its parallels to the experience of the murder victim identity and common plan or scheme, defendant did not renew his objection to strike after a voir dire on the testimony, the question was not objected to, and objections were sustained and motions to strike granted concerning other statements about the witness's feelings of bad vibes and eeriness, thus denigrating the witness's feelings in the eyes of the jury.

6. **Criminal Law § 101.2— proximity of jury room to courtroom—motion to examine jury to determine whether voir dire testimony heard—denied—no error**

The trial court did not err in a prosecution for second degree murder by failing to examine the jurors to see whether they could hear *voir dire* testimony from three women who testified that they had previously been the victims of assaultive behavior by defendant. Although defense counsel made the motion when he realized the proximity of the jury room to the courtroom and asserted that the district attorney had said there was a problem with the jury room and that such problem was known at the bar, defense counsel did not produce affidavits from the district attorney or any member of the bar and did not conduct tests himself.

APPEAL by defendant from *Seay, Judge.* Judgment entered 5 March 1985 in IREDELL County Superior Court. Heard in the Court of Appeals 10 December 1985.

Defendant was convicted of the second-degree murder of Dianne Thomas Gabriel. The State's evidence tends to show the following facts and circumstances. Dianne Gabriel was a licensed real estate agent for Century 21 Hecht Realty in Davidson. She was at home at Huntington Woods, a subdivision in Mooresville, with her husband Donald and daughter Donna on the morning of Monday, 18 July 1983. Ms. Gabriel was neatly dressed in blue slacks, red canvas shoes and a white blouse or sweater with colored stripes. Donna left the house about 11:30 a.m., shortly after which Ms. Gabriel left, in a hurry to get to the real estate office

and excited about several closings that week. Donald Gabriel left the house after 4:00 p.m. on a business trip to Columbia, South Carolina. Ms. Gabriel arrived at her office shortly before 12:00 p.m., remaining there for an hour or an hour and a half. She then left, indicating to the secretary that she expected a call from a Mr. McCorkle. She ate lunch at the Pier Restaurant on Highway 150, located approximately twenty-five minutes walk from defendant's residence, and returned to the office around 3:30 p.m., when she received phone calls. That afternoon she requested both Gary Rhyne, a fellow agent, and Bob Hecht, her employer, to accompany her to a house appraisal scheduled for 8:00 p.m. that evening. Hecht remembered the location as "Penicillin Point" and Rhyne remembered it as being at the "north end" of Lake Norman. Neither agent was available to accompany Ms. Gabriel that evening.

Troy and Teresa Helton met with Dianne Gabriel at about 5:15 p.m. to see some houses in Woodland Heights. When Ms. Helton had set up the meeting time earlier in the day, Ms. Gabriel had mentioned that she had a 7:30 appointment to meet someone at the Pier Restaurant. At the meeting with the Heltons, Ms. Gabriel appeared in good spirits. She asked the Heltons if they knew the man she was to meet that evening, but did not seem nervous or upset. Ms. Gabriel's gold-colored Buick, a Century 21 placard on the side, was seen parked at her home shortly after 7:00 that evening. She was subsequently seen driving away from Huntington Woods.

When Donald Gabriel returned home about 10:00 p.m. on Wednesday, he learned that his wife was missing. He began a search of his residence "to see if anything had happened in the house." He found nothing missing from the bedroom or closets but he found a note in the kitchen garbage can. The note read, in Ms. Gabriel's handwriting:

> House Highway 150, Paradise Peninsula, Hogan Road, three-bedroom house, vaulted ceiling, partial basement, Larry McCorkle, 664-2365. Hogan Road to second house on left, green house with green truck.

Mr. Gabriel gave this note to Detective Sergeant Cecil Cook of the Iredell County Sheriff's Department. It was later determined that the instructions on the note led to defendant's home.

Detective Cook had seen Ms. Gabriel's Buick parked at the Pier Restaurant at 9:00 or 9:30 p.m. on 18 July while he was patrolling the area. On 20 July, the Buick was identified as belonging to Ms. Gabriel and Detective Cook conducted a search of the car. No fingerprints were obtained. Ms. Gabriel's attache case and realtor signs were in the trunk, but no keys were found.

On 26 July 1983, Mr. Kenneth Hagler, a volunteer searcher for Ms. Gabriel, found a plastic trash bag near a drainage ditch by the road that led to what Mr. Hagler remembered as "Pinnacle Point," identified by Detective Sergeant Harold Miller of Iredell County, who recovered the bag, as Greenbay Road off Highway 150 West. Greenbay Road connects Paradise Peninsula Road to Hogan Road, where defendant's residence is located. Found within the trash bag were six sexually-oriented magazines, loose pages from other such magazines, pieces of gray duct tape bound together "in a circular-type position" and cut through once, a partially used roll of duct tape, braided nylon rope, bath cloths, a towel, two packages of plastic eating utensils and a ball-point pen. Approximately one hundred volunteers twice searched the area from the Pier Restaurant past the Paradise Peninsula Road turn-off through tangled undergrowth and then through the woods west to the lake, but nothing more was found.

State Bureau of Investigation (SBI) Special Agent Ricky Navarro lifted seven latent fingerprints of value from the trash bag, a plastic bag within the trash bag and the magazine pages. He was able to identify the prints as defendant's.

In early February 1984 Michael Canipe was walking in the snow in the wooded area between the McCrary Creek Access Area and Paradise Peninsula Road. This was the same general area that had been searched in July 1983. Canipe found a pocketbook, a red canvas shoe and a pair of blue slacks. Further searching by police personnel on 12 February uncovered a keycase with keys, a notepad containing some papers, a pair of women's panties and a second red canvas shoe. The pocketbook contained over a dozen separate items of identification of either Dianne or Donald Gabriel, including a checkbook on their joint account. The slacks, shoes and keycase were identified by Donald Gabriel as those belonging to his wife. The keycase contained keys that fit the gold Buick and unlocked the front door of the Gabriel residence.

The notepad contained directions to defendant's house and the beginnings of an appraisal of that house, the word fragment "firep" being the last entry. It was dated "7/19/83."

SBI Special Agent Scott Worsham, a forensic hair examiner, obtained hair samples from the Gabriel residence bathtub drain and a hairbrush belonging to Dianne Gabriel. He also obtained hair samples from defendant and defendant's residence. He compared these samples to hairs removed from the trash bag and its contents: hairs from the trash bag and the roll of duct tape were microscopically consistent with hairs from the Gabriels' bathtub drain; a hair from the length of nylon rope and hairs from the bath cloths were consistent with hair from Dianne Gabriel's hairbrush; two white dog hairs from the duct tape were consistent with dog hairs obtained from a couch in defendant's residence.

Analysis by Worsham also revealed that human hairs from the slacks and red shoe found at the McCrary Creek Access Area were microscopically consistent with hair from the Gabriels' bathtub drain. The hair from the shoe was crushed and the hairs from the slacks had tissue adhering at the root, an indication that these (head) hairs had been removed by force. White dog hairs from the slacks were consistent with dog hairs found at defendant's residence and on the duct tape from the trash bag.

SBI Special Agent John Wayne Bendure, an expert in fiber identification and analysis and a forensic chemist, conducted a search of defendant's residence on 2 May 1984 and obtained many fiber samples for comparison. After analysis of evidence taken from the trash bag, the McCrary Creek Access Area and defendant's residence, Agent Bendure determined that the bath cloths found in the trash bag were consistent in color, composition and manufacturing detail with bath cloths taken from defendant's residence. The duct tape in the trash bag was consistent in color, manufacture and manufacturer with duct tape found in defendant's residence. Some fragments of hosiery material had adhered to the pieces of duct tape from the trash bag. The tape appeared to be cut from two loops approximately four layers thick. The pieces of duct tape also yielded two types of blue polyester fiber, red rayon fibers, rust-colored trilobal nylon carpet fiber and orange polyester fiber. The two different types of blue polyester fiber were consistent with the two types of fiber used

to weave the material for the blue slacks found at McCrary Creek. The red rayon fiber on the duct tape was consistent with that used in the red canvas shoes. The carpet fiber was consistent with carpet found in defendant's bedroom. The orange polyester fiber was consistent with a "trace fabric" or "environmental contaminant" taken from couches in defendant's basement. Five different fibers found on the towel and bath cloths were consistent with fiber taken from defendant's couch. Orange polypropylene fiber found on the partial roll of duct tape and the bath cloths from the trash bag was consistent with that found on defendant's basement couch and a footstool in defendant's bedroom. Nylon fibers found on the basement couch were consistent with fibers taken from the nylon rope found in the trash bag.

The slacks found at McCrary Creek were cut on the outside of the pants leg crease on either side, then either cut or torn the rest of the way to the waistband. The panties were cut or torn in a similar fashion, so that the fabric was "totally laid open." There was a small quantity of adhesive in the hem area of the slacks leg. The color and viscosity of this adhesive and its elemental makeup were consistent with adhesive found on the duct tape. Blue polyester fibers on the underwear were consistent with the fibers of the blue slacks.

In his 2 May 1984 search of defendant's residence, Agent Bendure also found a mass of blue polyester fiber caught in a crack in the veneer at the base of defendant's bedroom door. This mass of fiber not only matched the fibers which made up Dianne Gabriel's slacks under the microscope, but it also matched the slacks in dye composition, a test Bendure was able to perform due to the amount of fiber found. In his opinion, the fibers had come from the same dye lot.

In further investigation carried out by Agent Bendure, he found that the trash bag was of the same size and manufacturer's markings as trash bags found in defendant's residence. Bendure also found sexually-oriented magazines in defendant's home, including the cover to a November 1979 *Playboy*. The centerfold to a November 1979 issue of *Playboy* was found in the trash bag. Strapping tape on the corners of the magazine pages found in the trash bag was consistent in thickness, composition, dimensional detail, number of filaments, diameter and color and effective in-

dex of filaments with strapping tape found at defendant's residence.

Federal Bureau of Investigation Special Agent Ronald Duncan, an expert in forensic chemical analysis, testified that the ink in the pen found in the trash bag was chemically identical to the ink on the notepad appraisal sheet found in the McCrary Creek Access Area.

Dianne Gabriel had made references to a client named McCorkle when speaking to her secretary, on the note found in the Gabriel kitchen trash and on a notebook in her office. Her desk appointment calendar listed an 8:00 p.m. appointment for 18 July with McCorkle. A car salesman testified that defendant had once represented himself to the salesman as "Mr. McCorkle."

Defendant presented no evidence.

Further evidence will be discussed as the opinion requires.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Joan H. Byers and Associate Attorney John H. Watters, for the State.*

*Walker, Palmer & Miller, P.A., by James E. Walker and H. Monroe Whitesides, Jr., for defendant.*

WELLS, Judge.

I.

In his first assignment of error, defendant contends that the trial court erred in denying defendant's motion to dismiss for insufficient evidence. The evidentiary principles governing motions to dismiss are set out at length in *State v. Earnhardt,* 307 N.C. 62, 296 S.E. 2d 649 (1982). Briefly summarized, they are that the evidence must be considered in the light most favorable to the State, with the benefit of all permissible favorable inferences. If the trial judge finds substantial evidence, regardless of weight, of each essential element of the crime, and that defendant committed it, the motion should be denied.

"Substantial evidence" may be defined as "any evidence tending to prove the fact in issue, or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction, and not

merely such as raises a suspicion or conjecture in regard to it . . . ." *Id.* The court is to consider all of the evidence actually admitted, whether competent or incompetent, which is favorable to the State. *Id.* Though all the evidence against defendant be circumstantial, that fact alone should not bar submission of the case to the jury. The test of the sufficiency of the evidence to withstand the motion to dismiss is the same whether the evidence is direct, circumstantial or both. *State v. Bullard,* 312 N.C. 129, 322 S.E. 2d 370 (1984). If the evidence presented is circumstantial, the question for the court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances. If so, it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty. *State v. Thomas,* 296 N.C. 236, 250 S.E. 2d 204 (1978).

Second degree murder is the unlawful killing of a human being with malice, but without premeditation and deliberation. *State v. Hutchins,* 303 N.C. 321, 279 S.E. 2d 788 (1981). In homicide cases, as in all criminal cases, the State must show that a crime was committed and that defendant committed it. *State v. Earnhardt, supra.* The evidence that a crime was committed is often referred to as the *corpus delicti,* meaning literally "the body of the transgression charged." *State v. Dawson,* 278 N.C. 351, 180 S.E. 2d 140 (1971). The death, the felonious cause of death and the identification of an accused as the person who caused the death can all be shown by circumstances from which these facts might reasonably be inferred. *See State v. Edwards,* 224 N.C. 577, 31 S.E. 2d 762 (1944). If the evidence is only circumstantial, it should be "so strong and cogent that there can be no doubt of the death." *State v. Dawson, supra.*

Dianne Gabriel's body was never found; therefore, the *corpus delicti* in this case must be shown by two logical steps. First, Dianne Gabriel must be shown to be dead; second, her death must be shown to be a result of a criminal agency.

## A.

[1] Defendant contends that despite the evidence brought out at trial, the State has not met its burden of establishing *corpus delicti.* To support this assertion, defendant cites Lord Chief Justice Hale who in turn cites Lord Coke for a case in which a

man was executed for the murder of his niece, who had disappeared. The niece had only run away and later returned to claim her property. Defendant also cites a case from 1661 in which a man was executed for killing a rent collector, who later turned up alive. In both these cases a strong reason for the "victims' " disappearances was suggested by the facts: The niece had run away to escape beatings by her uncle; the rent collector had absconded with the collected rents. There was no such apparent motive for Dianne Gabriel to disappear. To the contrary, there was much evidence tending to show strong motives on her part to continue enjoying the life she had been leading. Dianne Gabriel's life was not lived in the seventeenth and eighteenth centuries:

> In . . . Hale's day, a person might disappear beyond all possibility of communication by going overseas or by embarking in a ship. It would have been most dangerous to infer death merely from his disappearance. Worldwide communication and travel today are so facile that a jury may properly take into account the unlikelihood that an absent person, in view of his health, habits, disposition, and personal relationships would voluntarily flee, "go underground," and remain out of touch with family and friends. The unlikelihood of such a voluntary disappearance is circumstantial evidence entitled to weight equal to that of bloodstains and concealment of evidence.

*Epperly v. Com.*, 224 Va. 214, 294 S.E. 2d 882 (1982). We concur in the force of this logic.

That Dianne Gabriel would voluntarily disappear is so unlikely as to remove any doubt of its occurrence. There was nothing missing from her home, such as clothing or a suitcase. All the clothing she had been wearing when last seen, except a sweater or blouse, was found at the McCrary Creek Access Area. The last transactions on the joint bank account with her husband were a credit card payment in excess of $800 and a deposit in excess of $1,800, both dated 18 July. No further transactions on that account were recorded by the bank. Ms. Gabriel was shown to be a happy person, in good physical and mental condition. Her work habits were described as "very conscientious." Her employer described her as "as hard-working . . . as anybody I ever had." She had several closings expected that week, she made plans to

get back in touch with the Heltons and she had made tentative plans, as written in her notebook, to host an "Open House" for both the Heltons and "McCorkle" for 24 July.

Though Donald and Dianne Gabriel had separated for six or seven months half a year before Ms. Gabriel's disappearance, they had since reconciled. There was no evidence of continuing acrimony or ill feelings in the relationship. During the separation, it was Donald Gabriel who left the home. Dianne Gabriel had never disappeared or left home for any length of time previous to 18 July 1983. A police survey of thirteen hospitals and mental health centers failed to turn up any patients matching Ms. Gabriel's name or description. Moreover, there was no evidence that she was alive at the time of trial, a full nineteen months after her disappearance.

The foregoing evidence was clearly sufficient to establish the death of Dianne Gabriel.

## B.

[2] The State's evidence was sufficient to allow the reasonable inference that the cause of Ms. Gabriel's death was a criminal agency. There was no body or other physical remains found; this negates the inference that Dianne Gabriel died from suicide or natural causes. Had she died by accident, the presence of most of her clothing in the McCrary Creek Access Area would admit of no explanation.

Further evidence of criminal agency is found by Agent Bendure's testimony that the circular pieces of duct tape fit together where they had been cut once to form ankle-size loops for binding. That this exercise is logically consistent is shown by the presence on the duct tape of pieces of hosiery material and fibers from Ms. Gabriel's canvas shoes and polyester slacks. Both the slacks and the pair of underwear were cut and then torn or cut further to lay the fabric back totally. On the length of nylon rope was found a hair microscopically consistent with the hair of Dianne Gabriel. Hairs matching hers from the slacks and one of the shoes were crushed and had tissue adhering to the roots, indicating forcible removal. Ms. Gabriel was scheduled to appraise the house of a man who had given her a false name and false telephone number. This evidence was sufficient to allow the jury reasonably to infer that a criminal agency was the cause of Dianne Gabriel's death.

## C.

[3] Finally, in order to get to the jury, the State had to show that the criminal agent who caused Ms. Gabriel's death was the defendant.

Fingerprint evidence linked defendant to the trash bag and its contents. Hair strands linked the duct tape, rope, shoes, slacks and other items to Dianne Gabriel. Fiber evidence linked both defendant and Ms. Gabriel to the trash bag's contents and the clothing found in the woods and showed convincingly that Ms. Gabriel had been in defendant's home.

The foregoing evidence was manifestly credible. Fingerprint evidence is a common and reliable tool for police investigation and will not be discussed here. The similarities in the hair samples were testified to by Special Agent Worsham, an expert in forensic hair examination and identification. Examination of hair includes the comparison of the many variables of color, thickness and shapes of scales on the cuticle, the outside of the hair shaft; the colors, shapes, sizes and distribution patterns of pigments in the cortex, the inner core of the hair shaft; and cellular shapes, sizes and patterns of the medulla, or central core of the hair shaft. In referring to the microscopic consistency of two or more hairs, Agent Worsham stated that he meant that the hairs had scales the same thickness, character and size; the pigments in the hair were of the same size, color and distribution pattern; and the medullary characteristics were the same shape and size. The only hair evidence for which this did not hold true was the dog hair, which could only be identified as being from any white dog.

The fiber evidence was also analyzed with a high degree of precision and accuracy. Special Agent Bendure, an expert in fiber identification and analysis, testified that variables examined in relation to the fibers included the amount of dye absorbed, the amount, particle size and distribution of delustriant (soil-hiding chemicals), the shape of the fiber (which could be round, star-shaped, triangular, multi-lobed, etc.), color, detail (such as striations on the fiber), light-polarizing characteristics and solubility characteristics. Agent Bendure testified that when he said one fiber was "consistent with" another, that meant that there were no inconsistencies in any of the details examined. In addition, the

mass of blue polyester fiber found in the crack in defendant's bedroom door veneer was sufficiently large to determine that the dye composition was the same as that of Dianne Gabriel's blue slacks found at the McCrary Creek Access Area. Bendure testified that "it is very difficult, if possible, to choose things at random and find a fabric that has the same dye composition as another piece of fabric."

There was other evidence to connect defendant with Ms. Gabriel's death. In her notes and to other people Ms. Gabriel made at least four references to "McCorkle" or "Larry McCorkle" in connection with an appraisal of a house or directions which led to defendant's house. Defendant had previously been heard to represent himself as McCorkle, a boyhood friend who had not seen defendant in a decade. Defendant did not show up for work on 18 July. Three long-distance calls were made from defendant's residence to Hecht Realty on that day.

Items found to match similar objects in defendant's residence included the trash bag, the duct tape, the sexually-oriented pinup from the 1979 *Playboy*, the strapping tape on the pinups and the bath cloths.

An opportunity for defendant to commit the crime has thus been established. Considering the evidence of the duct tape bindings, the panties and slacks that were cut or torn open to expose the genital area and the presence of several sexually-oriented magazines in the trash bag, it is not difficult or unreasonable to infer a motive on the part of the criminal agent.

Inconsistencies in the State's evidence were explained at trial. The sheet on which appraisal information about defendant's residence was written was dated "7/19/83." Bob Hecht of Hecht Realty testified that it was not unusual for one of his agents to put the next day's date on the appraisal form when performing an evening appraisal because it was usually the next night that an agent would return to the home with an estimated value to do what he called the "listing presentation." A second point of confusion was Mr. Hecht's insistence that Dianne Gabriel had told him that she was to do an appraisal that evening at Penicillin Point, a spot on the north end of Lake Norman and approximately four miles north of defendant's residence. Gary Rhyne also remembered Ms. Gabriel's appraisal to be scheduled for some-

where at the "north end" of the lake. One of the roads near defendant's house was called "Paradise Peninsula Road." Another witness referred to the area near defendant's residence as "Pinnacle Point." Lt. Guy Griffin of the Iredell County Sheriff's Department testified that when Hecht had first given a statement, he had said that Ms. Gabriel had gone to appraise a house at "Peninsula Point." Taken in the light most favorable to the State, this evidence shows simply a confusion of place names.

We hold that the foregoing evidence is so strong and cogent as to leave no doubt that Dianne Gabriel is dead. It was also sufficient to allow the reasonable inference that she died by criminal agency and that the criminal agent was the defendant. This case properly went to the jury.

II.

[4] In his second assignment of error, defendant contends that testimony as to the telephone investigation of Detective Sergeant Sarah O'Connor of Iredell County was hearsay and its admission constituted prejudicial error. Detective O'Connor testified that she had called thirteen hospitals in North Carolina in reference to anyone matching the description of Dianne Gabriel. The following exchange then occurred:

Q: And what did you find out?

MR. WALKER: Objection.

COURT: Overruled.

A: The mental hospitals advised they had no unidentified females fitting her description, and they, and also the other normal health hospitals, advised they had not treated a Dianne Gabriel. There was one exception being, just one minute please. A hospital in Charlotte—it will take me a minute to find it—they advised they had a black female, and she was nineteen years old.

MR. WALKER: Objection and move to strike that.

COURT: Overruled.

The prosecutor had previously asked the witness, "When you called these institutions, what did you ask them?" The trial court

sustained an objection to this question, but the question made it apparent that Detective O'Connor's investigation had been over the telephone. For this reason, the later question, "And what did you find out?" clearly called for hearsay testimony and a timely objection should have been sustained. N.C. Gen. Stat. § 8C-1, Rules 802 and 901(6) of the Rules of Evidence. Instead, Detective O'Connor was allowed to testify fully as to the results of the investigation. Defendant's tardy objection does not make it clear whether it applies to the whole statement or solely to the remarks about the "black female." Moreover, there is no reasonable possibility that the result of this trial would have been different had that answer been struck. Detective O'Connor had already testified that she had checked thirteen hospitals, by no stretch of the imagination a comprehensive list of where Ms. Gabriel might be found if, as defendant asserts, "it is still possible for Dianne Gabriel to walk into any police department or hospital in these United States." The evidence that O'Connor had checked these places, that Dianne Gabriel was still missing after nineteen months and that the prosecution for murder against the defendant was proceeding all gave rise to the clear implication that Ms. Gabriel was not located during O'Connor's investigation, no matter if the negative results of that investigation had been detailed or not. Further evidence of the death of Dianne Gabriel, as detailed in Part IA of this opinion, demonstrates that the outcome of the trial was not affected by this testimony. N.C. Gen. Stat. § 15A-1443 (1983). This assignment is overruled.

## III.

[5] In his third assignment of error, defendant contends that the trial court committed prejudicial error by refusing to strike the testimony of real estate agent Nancy Ward. Ms. Ward was working for a realtor in Mooresville in late March or early April of 1983 when she received a call from a "Mr. E. J. Head" who wanted his property appraised. Ms. Ward related that she had gone to defendant's house, arriving there approximately ten minutes early for the 9:00 a.m. appointment that she had set up. A dog on the porch was the "only sign of life" she saw; the windows were closed and the drapes were pulled. She did not knock on the door, instead leaving her card on the porch railing with a note to Mr. Head that she would call him later.

In a call to defendant's residence later that day, two male voices, both answering to the name "Mr. Head," but the first identifying the second as the father, denied having called Ms. Ward to come appraise the house. The information was partially elaborated and clarified during cross-examination.

Defendant first contends that the whole of Ms. Ward's testimony should have been struck as irrelevant. We disagree. The testimony was to show, by its parallels to the experience of Dianne Gabriel, identity and common plan or scheme of defendant to lure female real estate agents to his house. N.C. Gen. Stat. § 8C-1, Rule 404(b) of the Rules of Evidence; *see, e.g., State v. Bartow*, 77 N.C. App. 103, 334 S.E. 2d 480 (1985).

Defendant also contends that it was error to allow Ms. Ward to testify on re-direct:

Q: You indicated that you didn't like the looks of the house on cross-examination — why not?

A: I guess it is a kind of an unknown. I felt like I was being watched.

MR. WALKER: Objection.

COURT: Sustained.

MR. WALKER: Move to strike.

COURT: The objection is sustained.

The prosecutor then moved for a *voir dire* on the testimony. After the *voir dire*, the trial court did not instruct the jurors to strike that testimony from their memory and defense attorney did not renew his motion to strike. Moreover, the question, which clearly called for a possibly inadmissible response, was not objected to.

Even considering the issue on its merits, we hold that no prejudice was caused by this statement. Defendant asserts that other inadmissible "feelings" of the witness had been stated, *e.g.*, her "bad vibes" and "eerie feelings," and that the cumulative effect of this was to prejudice defendant. When these other statements were made, however, objections were sustained and motions to strike, when presented, were granted. When the court withdraws incompetent evidence and instructs the jury not to

consider it, any prejudice is ordinarily cured. *State v. Craig*, 308 N.C. 446, 302 S.E. 2d 740, *cert. denied*, 464 U.S. 908, 104 S.Ct. 263, 78 L.Ed. 2d 247 (1983). The cumulative effect of the sustained objections to Ms. Ward's testimony would be to denigrate her "feelings" in the eyes of the jury. We hold that this statement created no prejudice and overrule this assignment of error.

## IV.

In his fourth assignment of error, defendant contends that the prosecutor engaged in misconduct and improper argument that prejudiced the trial. Where appropriate, the trial court properly sustained objections to questionable behavior by the prosecutor and admonished the jury in a curative instruction, which cured any possible prejudice. *State v. Sanders*, 303 N.C. 608, 281 S.E. 2d 7, *cert. denied*, 454 U.S. 973, 102 S.Ct. 523, 70 L.Ed. 2d 392 (1981). In light of the whole record, the conduct of both the prosecutor and counsel for the defense reveal nothing more than zealous advocacy in a hotly contested case. Defendant has failed to show any prejudice resulting from the conduct of the prosecutor. This assignment is overruled.

[6] The State presented evidence on *voir dire* from three female witnesses who testified that they had been victims of previous assaultive behavior by the defendant. In his fifth and final assignment of error, defendant contends that the trial court erred in failing to conduct an examination of the jurors to determine whether they could hear that *voir dire* testimony. Defense counsel first made this motion when he realized the proximity of the jury room to the courtroom. The trial court refused to conduct any investigation unless there were "some evidence offered in the form of motions and so forth concerning impropriety."

MR. WALKER: I bring this up partially because the District Attorney has said there is a problem about acoustics and that things can be heard in that room. I don't practice here regularly. If I had, I would have been making a motion that they not be in that room yesterday, and I wasn't aware there was a problem either; but, apparently, it is known at this Bar that there is a problem; and, when you consider the volume that went into the remarks yesterday by the witness and the two lawyers, myself included, then I think there was more than the usual opportunity for the Jury to have heard it.

COURT: Bring the Jury back.

In the absence of controlling statutory provisions or established rules, all matters relating to the orderly conduct of the trial or which involve the proper administration of justice in the courts are within the trial judge's discretion. *State v. Young,* 312 N.C. 669, 325 S.E. 2d 181 (1985). The presiding judge is given large discretionary power as to the control of the trial. *Id.* This discretion extends to investigations of possible improprieties concerning the jury. *State v. Selph,* 33 N.C. App. 157, 234 S.E. 2d 453 (1977). Depending on the definite character of the allegations made, it may not be necessary for the trial court to conduct an investigation. *Stone v. Baking Co.,* 257 N.C. 103, 125 S.E. 2d 363 (1962).

In the case below, defense counsel asserted that the district attorney had said there was a problem with the jury room and that such problem was "known at this Bar," but counsel failed to produce any affidavits from either the district attorney or another member of the Bar attesting to the truth of this allegation; neither did counsel conduct tests of the room himself. The trial court asked for evidence and none was forthcoming. The court stated its personal knowledge that the jury deliberation room had been in use for "twelve or fifteen years." "The circumstances must be such as not merely to put suspicion on the verdict because there was opportunity and a chance for misconduct, but that there was in fact misconduct. When there is merely a matter of suspicion, it is purely a matter in the discretion of the presiding judge." *State v. Johnson,* 295 N.C. 227, 244 S.E. 2d 391 (1978). This assignment is overruled.

Defendant received a fair trial, free from prejudicial error.

No error.

Judges ARNOLD and WEBB concur.