**CHRIS CARTY, Appellant/Defendant**

**v.**

**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Criminal No. 2009-0034

Supreme Court of the Virgin Islands

February 28, 2012

346

347

J. DARYL DODSON, ESQ., Moore, Dodson & Russell, P.C., St. Thomas, USVI, *Attorney for Appellant.*

PAMELA R. TEPPER, ESQ., Assistant Attorney General, St. Thomas, USVI, *Attorney for Appellee.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice.*

## OPINION OF THE COURT

(February 28, 2012)

SWAN, *Associate Justice.* Appellant, Chris Carty ("Carty"), appeals his convictions for Attempted Second Degree Murder; First Degree Assault;

Using a Dangerous Weapon during First Degree Assault; Second Degree Murder; and Using a Dangerous Weapon during Second Degree Murder. These convictions emanated from two unrelated incidents which occurred on the same afternoon a short distance from each other. In the first incident Carty assaulted Errol Stuart ("Stuart"), and in the second incident Carty murdered Glen Blyden ("Blyden"). These crimes were initially filed as two cases but were later consolidated into one case.

On appeal, Carty asserts four claims of error by the trial court. First, Carty argues that the trial court erred when it ruled, before consolidating the two cases, that evidence of the assault in the first incident was admissible during the trial on the murder charge as a prior bad act under Federal Rules of Evidence (FRE) 404(b). Second, Carty argues that the trial court erred in refusing to allow copies of the final jury instructions to be taken into the jury deliberation room despite the individual requests of the prosecution, the defense and the jury. Third, Carty argues that the trial court erred by allowing prejudicial testimony from Blyden's sister during the trial and by admitting in evidence an enhanced photograph of Blyden. Lastly, Carty argues that the trial court erred in denying his Motion to Dismiss the charges because of a violation of his Sixth Amendment right to a speedy trial. Consequently, Carty urges us to reverse his convictions and remand the case to the trial court with instructions to dismiss the case, or in the alternative, grant him a new trial. We reject Carty's contentions and will affirm his convictions and the May 6, 2009 Judgment of the Superior Court.

## I. FACTS AND PROCEDURAL HISTORY

The facts and procedural posture surrounding Carty's convictions are as follows: On January 28, 2007, between 3:00 p.m. and 4:00 p.m., Carty approached a food vender's booth commonly known as the Ital Booth located across from the Lionel Roberts Stadium in the Hospital Ground area on St. Thomas. The attendant at the booth, a vegan cook named Errol Stuart, had his back towards Carty as Carty entered the booth. Upon sensing the presence of someone behind him, Stuart turned around and observed Carty, who was visibly inebriated, standing behind him.

Carty asked Stuart for some "funta."[1] Stuart bellicosely demanded that Carty leave the booth, while he simultaneously attempted to kick Carty.

---

[1] Funta is a blend of leaf tobacco that is used to roll marijuana. *See* J.A. at 415.

Carty immediately withdrew a pair of scissors from his waist and relentlessly stabbed Stuart in the mouth and approximately seven times in Stuart's eye, severing its optic nerve. Attempting to defend himself, Stuart kicked Carty, causing Carty to fall against a stove in the booth. Thereafter, Carty stood up and ran away from the booth. Stuart started to chase after Carty but eventually abandoned his pursuit. Approximately ten or fifteen minutes later, a bystander aided Stuart by applying pressure to his head with a shirt, while attempting to stop the torrent of blood flowing from his eye. While awaiting the arrival of an ambulance, the bystander stayed with Stuart until one of the Ital Booth's owners transported Stuart to the Roy Lester Schneider Hospital ("Hospital"). At the Hospital, Stuart received medical treatment for his severe injuries.

After Carty committed his vicious assault upon Stuart, he immediately proceeded to an area of Hospital Ground commonly called "Jah Yard" where he encountered a group of men in the yard area of a house. Carty arrived at the yard wearing a pair of denim shorts and no shirt. Carty proceeded to engage in aberrant behavior by incessantly jumping in the immediate area of the men and gyrating around the table where the men sat, some of whom were engaged in a game of dominoes. Suddenly, Carty ceased his antics and stood behind one of the men whose name was Glen Blyden. When Blyden asked Carty what was wrong with him, Carty responded by asking, "What happen?" and simultaneously pushed Blyden. Blyden immediately rose from his seat to confront Carty. Carty then punched Blyden in the face and pushed Blyden downward into his seat. An altercation immediately erupted between Blyden and Carty.

In an attempt to defend himself from Carty's onslaught, Blyden struck Carty in his head with a rock. Notwithstanding the blow to his head, Carty continued his unrelenting attack upon Blyden, eventually stabbing Blyden in the neck. During the fracas, Blyden had stumbled against one of the vehicles in the yard. One of the witnesses observed Blyden bleeding profusely and asked Blyden whether he was okay. Blyden said he was not okay. One of the men then assisted Blyden into his vehicle and hurriedly transported Blyden to the Hospital. Shortly after his arrival at the Hospital's emergency room, a physician pronounced Blyden dead. An autopsy report on Blyden confirmed that the cause of death was a single stab wound to the neck.

After both incidents, and in response to a 911 telephone call, Detective Albion George was dispatched to the scene of the stabbing at the Ital

Booth. At the scene, the bystander who had assisted Stuart told the detective what had transpired between Stuart and Carty. Another eyewitness to the Ital Booth incident informed the detective that after the incident Carty had proceeded towards the vicinity of the fish market, which is contiguous to Lionel Roberts Stadium and directly across from "Jah Yard." Upon arriving at the fish market, Detective George observed Carty engaged in aberrant behavior. Detective George then restrained Carty with handcuffs and footcuffs.

Detective George proceeded to the Hospital to further investigate the stabbing at the Ital Booth. Upon arriving at the hospital, the detective was informed that another victim, Blyden, had succumbed to injuries inflicted upon him by Carty. Detective George contacted the Major Crime Unit of the Virgin Islands Police Department for that unit to continue the homicide investigation. Detective Maha Hamden ("Detective Hamden") was dispatched to the crime scene at "Jah Yard" to collect evidence of the crime. Detective Hamden took photographs of the crime scene and recovered a bloody knife, which was purportedly used to stab and to kill Blyden. She also retrieved a bloody rock from the crime scene.

On January 29, 2007, Detective George returned to the Hospital to interview Carty about the incident at the Ital Booth. Carty was at the Hospital seeking medical attention for the injuries he sustained during his "Jah Yard" deadly altercation with Blyden. Detective George advised Carty of his *Miranda* rights; however, Carty waived his rights and gave a statement about the two incidents. Carty admitted that he was at the Ital Booth on January 28, 2007 and that he had stabbed Stuart. Carty further admitted to entering "Jah Yard" after his altercation with Stuart at the Ital Booth. Carty also admitted that he had been drinking an alcoholic beverage known as "Brugal." Carty explicated that on the same day of both incidents, he was shirtless and was wearing short pants, thereby corroborating witnesses' description of how Blyden's assailant was attired. On February 5, 2007, Detective George visited Stuart at his residence for Stuart to review a photo array. While scrutinizing the photo array, Stuart unhesitatingly identified Carty as his assailant.

On February 6, 2007, Carty was charged in a six-count Information with crimes deriving from the murder of Blyden.[2] These charges included First Degree Murder; Felony Murder; Second Degree Murder; Using a Dangerous Weapon during a Second Degree Murder; Assault in the First Degree; and Using a Dangerous Weapon during an Assault in the First Degree. On February 7, 2007, the Attorney General filed a separate, four-count Information charging Carty with crimes originating from his assault upon Stuart. These charges included Attempted First Degree Murder; Carrying or Using a Dangerous Weapon during Attempted First Degree Murder; Assault in the First Degree; and Carrying or Using a Dangerous Weapon during an Assault in the First Degree. The People moved to consolidate the criminal charges from both incidents. Carty opposed consolidation of the charges. Additionally, in Carty's trial for the murder of Blyden, the People filed a Motion to Admit Prior Bad Acts, including Carty's assault upon Stuart. Carty opposed this motion. On August 13, 2008, the trial court granted the Motion to Admit Prior Bad Acts and ordered consolidation of the two cases.

On March 2, 2009, the People filed a nine-count Second Amended Information. The Second Amended Information charged Carty with Attempted First Degree Murder, a violation of title 14, sections 921, 922(a)(1) and 331 of the Virgin Islands Code; Using a Dangerous Weapon During an Attempted First Degree Murder[3] in violation of title 14, section 2251(a)(2)(B) of the Virgin Islands Code; First Degree Assault, in violation of title 14, section 295(3) of the Virgin Islands Code; Using a Dangerous Weapon During a First Degree Assault, in violation of title 14, section 2251(a)(2)(B) of the Virgin Islands Code[4] First Degree Murder, in violations of title 14, sections 921 and 922(a)(1) of the Virgin Islands Code; Second Degree Murder, in violation of title 14, sections 921 and 922(b) of the Virgin Islands Code; Using a Dangerous Weapon During a Second Degree Murder, in violation of title 14, section 2251(a)(2)(B) of

---

[2] This was the first of several versions of the Information that the People filed with the trial court.

[3] The Second Amended Information inaccurately charges Carty for Using a Dangerous Weapon During an Attempted First Degree Murder, in violation of title 14, section 2251(a)(2)(B). However, title 14, section 2251(a)(2)(B) is titled "Carrying or using Dangerous Weapons." There is no mention of attempted first degree murder under this statute.

[4] The charges against Carty in Count Four of the Amended Information are likewise inaccurate. *See* Footnote 3.

the Virgin Islands Code[5] First Degree Assault, in violation of title 14, section 295(3) of the Virgin Islands Code; and Using a Dangerous Weapon During a First Degree Assault, in violation of title 14, section 2251(a)(2)(B) of the Virgin Islands Code[6] During the approximately two years the case was pending, a plethora of motions were filed by both the People and Carty, and several hearings were held. From March 2 through March 4, 2009, the trial court conducted a jury trial on the nine-count Second Amended Information.

During deliberations, the jury sent a note to the judge, requesting that they be provided a written copy of the final jury instructions, to refresh their memories about the final jury instructions on the crimes in the Second Amended Information. The trial court denied the jury's request for a copy of the final jury instructions, despite objections to the trial court's ruling from both the prosecutor and the defense attorney.

On March 4, 2009, the jury found Carty guilty of Counts Three, Four, Six, and Seven, and not guilty of Counts One,[7] Two, Five, Eight, and Nine. On March 13, 2009, Carty filed a Rule 29 Motion for Judgment of Acquittal, or in the Alternative for a New Trial. On April 3, 2009, the People filed its Opposition to Defendant's Post-trial Motion for Judgment of Acquittal. On April 17, 2009, Carty filed his Notice of Appeal. On May 7, 2009, the trial court entered its Judgment and Commitment.

## II. JURISDICTION

Title 4, section 32(a) of the Virgin Islands Code vests this Court with jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court. The Superior Court entered a final order on May 7, 2009; therefore, we have jurisdiction to hear this appeal.

## III. STANDARD OF REVIEW

We review the trial court's decision concerning the admissibility of evidence for abuse of discretion. *United States v. Starnes*, 583 F.3d 196, 213-14, 52 V.I. 1051 (3d Cir. 2009); *Brito v. People*, 54 V.I. 433, 438 (V.I.

---

[5] *See, supra*, note 3.

[6] *See, supra*, note 3.

[7] Although the jury found Carty not guilty of Count One, Attempted First Degree Murder, Appellant was found guilty of the lesser-included offense, Attempted Second Degree Murder.

2010). We also review for abuse of discretion the trial court's decision to deny the jury's and the parties' requests for the jury to take a copy of the final jury instructions into the jury deliberation room. *United States v. Jones*, 353 F.3d 816, 818 (9th Cir. 2003). Our review of all constitutional questions of law is plenary. *United States v. Diaz*, 592 F.3d 467, 470 (3d Cir. 2010); *Estate of Ludington v. Jaber*, 54 V.I. 678, 681 (V.I. 2011).

## IV. DISCUSSION

**A. The issue of whether the trial court erred in allowing evidence of the assault upon Stuart to be introduced at the trial for the murder of Blyden, as evidence of Carty's prior bad act under Rule 404(b) of the Federal Rules of Evidence, is moot because the trial court subsequently consolidated the charges.**

■ Carty asserts that the trial court erred in admitting into evidence Carty's assault upon Stuart in Carty's trial for assaulting and murdering Blyden, as a prior bad act under Rule 404(b) of the Federal Rules of Evidence.[8] (Appellant's Br. 1.) Rule 404(b) instructs as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Before the trial court consolidated the two cases, the charges against Carty for assaulting Stuart at the Ital Booth would have been subject to a Rule 404(b) determination, if the People had attempted to use the same assault as evidence in the case charging Carty with Blyden's murder. However, this issue became moot at the January 14, 2009 Status Conference when the trial court consolidated both cases. After the January 14, 2009 Status Conference, the consolidated cases transformed into a single criminal case, which

---

[8] Although Carty cites to the Federal Rules of Evidence, the Uniform Rules of Evidence were in effect at the time of Carty's trial. However, this fact does not affect our analysis of this issue.

was evidenced by the nine-count Second Amended Information filed by the People on March 2, 2009. With the consolidation of both cases, the assault charges against Carty for the incident at the Ital Booth were no longer subject to Rule 404(b) as prior bad acts, because the same charges then became an integral part of the nine-count Second Amended Information and crimes to be proven at trial.

Importantly, the trial court consolidated the cases well in advance of jury selection and the trial; therefore, the Rule 404(b) issue was never considered by the jury. The jury was unaware that the evidence of Carty's assault upon Stuart was previously offered by the People as a prior bad act under Rule 404(b). Furthermore, Carty's counsel initially consented to the consolidation and has not challenged the consolidation on appeal.

## B. The trial court properly exercised its discretion in denying the parties' requests that the jurors take a copy of the final jury instructions into the jury deliberation room.

Carty asserts that the trial court should have granted his Motion for a New Trial because the trial court erred when it denied the jury's request to review the final jury instructions during deliberation. (Appellant's Br. 20.) Carty further asserts that the jury instructions were unusually complicated and that, as a result, the jurors were justified in requesting them for review during deliberations. As further justification for his Motion, Carty asserts that the final jury instructions encompassed one hundred twenty-five pages of the trial transcript, and that the time required for the trial court to recite the final instructions to the jury encompassed four hours. (*Id.* at 20.)

The decision of whether the final jury instruction should be submitted to the jury during deliberation is within the sound discretion of the trial judge. *United States v. Conley*, 503 F.2d 520, 522 (8th Cir. 1974). In *Conley*, the United States Court of Appeals for the Eighth Circuit held that a trial court's rejection of an appellant's request to submit the final instructions to a jury in written form was not an abuse of discretion. *Id.* Other federal circuits have consistently opined that a trial court's decision to provide the jury with written final instructions during deliberation is discretionary. *Jones*, 353 F.3d at 818; *United States v. Russo*, 110 F.3d 948, 953 (2d Cir. 1997); *United States v. Sotelo*, 97 F.3d 782, 792 (5th Cir. 1996); *United States v. Blane*, 375 F.2d 249, 255 (6th Cir. 1967); *United*

*States v. Massey*, 89 F.3d 1433, 1442 (11th Cir. 1996); *Oertle v. United States*, 370 F.2d 719, 729 (10th Cir. 1966).

Carty cites authority from other jurisdictions in asserting that "[t]he refusal, in the face of a specific request to provide a copy of the jury instructions to the jury in such a complicated case, constitutes error." (Appellant's Br. 21.) First, Carty relies on *Oliver v. State*, 286 Ark. 198, 691 S.W.2d 842 (Ark. 1985). In *Oliver*, the Supreme Court of Arkansas concluded that the trial court erred when it declined to send a copy of the final jury instructions to the jury room during deliberation. *Id.* at 842. However, *Oliver* is distinguishable from this case because, unlike the Virgin Islands, there was a court rule in Arkansas, a predecessor to current Rule 33.3 of the Arkansas Rules of Criminal Procedure,[9] that explicitly mandated that the judge deliver a typewritten copy of the oral instructions to the jury upon the request of either party or any juror. *Id.*

Second, Carty relies on *United States v. Van Dyke*, 14 F.3d 415 (8th Cir. 1994) to support his assertion that a trial court commits error when it rejects a specific request to provide a copy of the final jury instructions to the jury in a complicated case. In *Van Dyke*, the Eighth Circuit held that the trial court abused its discretion when it failed to make its written final instructions available to either party's counsel or to the jury. *Id.* at 423. The Eighth Circuit explicated in *Van Dyke* that the trial in this case encompassed more than two weeks, that the trial pertained to a complex series of transactions, and that the trial involved a multiple-count indictment. *Id.* The Eighth Circuit made an acute distinction between *Van Dyke* and its previous holding in *Conley*, opining that in *Conley* the trial encompassed less than two days, and there were no complicated issues. *Id.* Notwithstanding its holding in *Van Dyke*, the Eighth Circuit re-emphasized the general rule that the decision to provide a jury with a copy of written final jury instructions is within the sound discretion of the trial court. *Id.*

Finally, Carty relies on *Chappell v. State*, 423 So.2d 984 (Fla. Dist. Ct. App. 1982), in asserting that a failure to provide a copy of jury instructions to the jury upon request constitutes error. However, Carty's

---

[9] Since the Supreme Court of Arkansas' 1985 decision in *Oliver v. State*, 286 Ark. 198, 691 S.W.2d 842 (Ark. 1985), the former Rule 36.22 of the Arkansas Rules of Criminal Procedure was renumbered to Rule 33.3 and amended with a new title, effective January 1, 1996, and was amended a second time on February 15, 2001.

reliance on *Chappell* is misplaced and spurious. In *Chappell*, the District Court of Appeal of Florida interpreted the former Rule 3.400(c) of the Florida Rules of Criminal Procedure,[10] and held that "when the court elects to utilize the rule, it must be literally complied with by furnishing the jurors with all the written charges concerning matters about which they have been previously instructed." *Id.* It is significant that Florida had a court rule on this issue whereas the Virgin Islands has no court rule on the issue.

■ Courts have developed view points on whether the jury should receive copies of final jury instructions during deliberations. One approach, as enunciated by United States Court of Appeals for the Ninth Circuit in the *Jones* case, is that the trial court must, "in exercising its discretion, take into account such factors as the number and complexity of the issues litigated, the complexity of the charges and evidence presented, and other factors that may affect the jury's full understanding of the case." *Jones*, 353 F.3d at 818. However, there is also a different perspective as articulated by the United States Court of Appeals for the Fifth Circuit, which opposes the practice of providing a jury with written instructions: "[w]hile not error in itself, the practice is conducive to dissection of the charge by the jury and overemphasis of isolated parts rather than consideration of the charge as a whole." *United States v. Schilleci*, 545 F.2d 519, 526 (5th Cir. 1977). Neither approach expresses an overarching rule on the issue of allowing final jury instructions into the jury deliberation room, thereby allowing the trial judge to make the final decision on this issue. Therefore, our reversal of the trial judge is only merited if there is an abuse of discretion. To reiterate, no Virgin Islands statute or case law precedent mandates that trial courts in this jurisdiction provide the jury with written final jury instructions for their use during jury deliberation.

■ The trial encompassed three days commencing on March 2, 2009, and concluding on March 4, 2009. For a case involving two separate incidents and major felonies, including first degree murder, the case was

---

[10] Since the District Court of Appeal of Florida's 1982 decision in *Chappell v. State*, 423 So.2d 984, Rule 3.400(c) of the Florida Rules of Criminal Procedure was amended and took effect on May 31, 1995, and subsequently, October 4, 2007, and finally January 1, 2008. The current Rule 3.400 only contains subsections (a) and (b).Therefore, subsection (c) appears to have been repealed.

noticeably short, and the testimony and evidence were very straightforward. The Second Amended Information was comprised of nine counts, including charges of murder, assault, and using a dangerous weapon during these acts. No novel, intricate or complex facts or issues existed in this case. The four hours it took the trial court to read the final jury instruction could have resulted from the number of charges and not the complexity of the case. Carty is reminded that the trial court imparted the final instructions to the jury immediately before jury deliberation. Significantly, the trial judge expressed to the jurors her willingness, upon request, to reread the final jury instructions to them. (J.A. at 992.) Moreover, no compelling circumstances existed in this case to warrant the jury having a written copy of the final instructions for use during deliberation. Accordingly, we conclude that no abuse of discretion occurred when the trial court denied the parties' and jury's requests to allow the jury to review the written final jury instructions during jury deliberation.

## C. The trial court erred when it admitted into evidence the testimony of Blyden's sister, together with a photograph of Blyden; however, the error was harmless.

Carty avers that the trial court erred when it allowed the. People to introduce highly prejudicial evidence during the trial. Specifically, Carty contends that the trial court "admitted the extremely emotional and prejudicial testimony of the sister of the decedent about the impact of [Blyden's] death on her [individually] and her family, and admitted an extremely prejudicial photograph of the decedent, at his son's high school graduation, with doves of peace superimposed on the photograph." (Appellant's Br. 22.)

The danger of unfair prejudice exists if the evidence "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case." *Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184, 193 (3d Cir. 1990) (citing *Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir. 1980); and 1 J. Weinstein & M. Berger, Weinstein's Evidence P 403(03), at 403-15 to 403-17 (1978)) (internal quotation marks omitted).

Despite Carty's objection to the testimony of Blyden's sister on the basis of relevancy, the trial court permitted the sister to testify about the

close relationship she had with Blyden and the financial assistance Blyden often provided to her. Furthermore, the trial court permitted the sister to testify about Blyden's hobbies and future goals. (Trial Tr., Vol. II, 93 - 95, Mar. 3, 2009.) Additionally, over Carty's objection, the trial court admitted into evidence the previously mentioned photograph of Blyden at his son's graduation. (*Id.* at 101.) Unquestionably, the testimony of Blyden's sister and the photograph of Blyden at his son's graduation were irrelevant to the issue of Carty's guilt or innocence in the murder of Blyden. Under title 5, section 771, evidence is only relevant if it has "any tendency in reason to prove any material fact." Neither the testimony nor the photo was likely to prove any fact material to Carty's case. Irrefutably, both the photo and the sister's testimony were prejudicial because they constituted irrelevant evidence that only served to appeal to the sympathy of the jurors.

Nonetheless, we conclude that the trial court's abuse of discretion under the circumstance in this case constituted harmless error. Under Supreme Court Rule 4(i), "No error or defect in any ruling or order or in anything done or omitted by the Superior Court or by any of the parties is ground for granting relief or reversal on appeal where its probable impact, in light of all of the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties." Because the evidence the People presented against Carty was overwhelming and more than sufficient to convict Carty beyond a reasonable doubt, the outcome of the case would have been the same, if the testimony of Blyden's sister and the photograph of Blyden at his son's graduation had been excluded from the trial.

For example, Carty committed all the crimes during daytime hours and in proximity to all eyewitnesses, thereby making the possibility of a misidentification of him as the perpetrator of the crimes almost nil. Crucially, both Stuart and Carty attended the J. Antonio Jarvis Elementary School and were in the same third grade class. (J.A. at 406.) Both men knew each other for most of their lifetimes. Unquestionably, Stuart, who testified at trial, knew Carty exceptionally well and could easily identify Carty as his assailant. Stuart, the victim in the first incident, graphically testified at the trial concerning Carty's vicious assault upon him and the circumstances surrounding the assault.

In the second incident involving the death of Blyden, several eyewitnesses testified about Carty's actions and behavior. These

eyewitnesses had an opportunity, from within a few feet of the incident, to observe Carty before, during, and after his deadly altercation with Blyden. When Carty began his gyration and aberrant behavior around the men and the domino table, he simultaneously invited their undivided attention to him, making a subsequent misidentification virtually impossible. Fitzroy Henry ("Fitzroy"), an eyewitness, testified that he saw Carty removed a knife from his pocket and stabbed Blyden. Fitzroy further stated that Blyden had no weapon with him at the time of his altercation with Carty. (J.A. at 431, 455.) Crucially, the blood found on the knife taken from Carty was determined to be Blyden's blood. (J.A. at 694.) This fact was confirmed by the forensic examiner's testimony regarding the identity of the person whose DNA was found on the knife. (J.A. 632.) Fitzroy had taken the knife or murder weapon from Carty's possession after the altercation. (J.A. at 451-52.)

Keithroy Henry ("Keithroy"), another eyewitness, described how Carty stabbed Blyden, which resulted in Blyden's demise. (J.A. at 426-28.) The trial record before us does not reveal that any one of the eyewitnesses' testimony was impeached or contradicted by credible evidence. Importantly, Carty was arrested on the same afternoon of both altercations in the "Jah Yard" area where the Blyden stabbing occurred. Additionally, we cannot ignore the fact that Carty was in the hospital for treatment of injuries he sustained during his deadly altercation with Blyden on the same day of Carty's assault upon Stuart. (J.A. at 514.) Also, Carty admitted to Detective George that after he stabbed Stuart he then proceeded to "Jah Yard." (J.A. at 519.) The trial record confirmed that Carty's altercation with Blyden, which resulted in Blyden's death, occurred in the "Jah Yard" area of Hospital Ground. Carty's description of his attire on the day of both incidents corroborated witnesses' description of how Blyden's assailant was attired. (J.A. at 429, 521.) Therefore, considering the eyewitness testimony and the avalanche of other credible supporting evidence in the case, there was sufficient evidence for a jury to find Carty guilty of all crimes. Therefore, the sister's testimony and photograph of Blyden, although prejudicial, would not have made a difference in the jury's verdicts. Accordingly, the trial court's ruling of admitting the evidence constituted harmless error.

**D. The trial court did not err when it denied Carty's Motions to Dismiss the case because of a Violation of Carty's Sixth Amendment Right to a Speedy Trial.**

■ Carty argues that the trial court erred in denying his motions to dismiss for violation of his right to a speedy trial. Carty argues that his Sixth Amendment right to a speedy trial had been violated because he was incarcerated in excess of two years before he was afforded a jury trial. (Appellant's Br. 24.) Under the Sixth Amendment of the United States Constitution, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have a speedy, and public trial . . . ."[11] The right to a speedy trial attaches at the time of an arrest or formal charge and protects a defendant from undue post-accusation delay. *United States v. Marion*, 404 U.S. 307, 313, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971). The Sixth Amendment right to a speedy trial is necessary to protect the rights of the defendant which may be hampered by undue and oppressive incarceration prior to trial, anxiety and concern accompanying public accusation, and the possibility that a long delay will impair the ability of an accused to present a defense. *Klopfer v. North Carolina*, 386 U.S. 213, 221-22, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967).

In addition to Carty's assertion that he was incarcerated for over two years, Carty claims that he was subject to abuse by the prison guards, and that his ability to prepare a defense was hampered because he could not interview witnesses in a timely manner. Carty advances a claim that impels us to evaluate the voluminous record of contested filings which required an inordinate amount of time for the trial court to resolve and therefore contributed to the unavoidable delay in this case. Moreover, because the cornerstone of Carty's Sixth Amendment constitutional right violation is anchored in the delay of his trial and to fully understand the primary cause of the delay, it is imperative that we punctiliously recite the case's protracted history before addressing Carty's claim.

Carty was arrested on January 29, 2007. On February 6, 2007 and February 7, 2007 separate informations were filed, charging Carty with the assault upon Stuart and the murder of Blyden. On February 6, 2007, the same day the first Information was filed, the People moved to

---

[11] The right to a speedy trial under the Sixth Amendment is applicable to the Virgin Islands Code through the Revised Organic Act. 48 U.S.C. § 1561; Revised Organic Act of 1954, § 3.

consolidate the two cases or to join the offenses into one Information. Carty opposed the People's Motion on February 13, 2007. At a pre-trial detention hearing held on the same day, the trial court heard arguments concerning the consolidation of both cases and ordered the parties to file memoranda of law by February 28, 2007, addressing the issue of whether under Federal Rule of Evidence 404(b) the assault Carty committed upon Stuart would be admissible in the case regarding Blyden's murder. On February 22, 2007, the People filed its memorandum urging admissibility of the prior bad acts. On February 28, 2007, defense counsel filed an opposition to the joinder of offenses and the use of prior bad acts.

Other matters were forthcoming before the trial court ruled on the issues of consolidation, joinder and admission of prior bad acts. Specifically, on February 28, 2007, the People made a demand for discovery materials. Subsequently, on March 1, 2007, defense counsel filed an Emergency Motion to Compel Discovery stating that the People had not complied with the defense's discovery requests in a timely manner. Other filings were made by the People on March 5, 2007, March 13, 2007, March 14, 2007, March 20, 2007, March 21, 2007, March 26, 2007, and March 28, 2007 which included discovery material.

On May 18, 2007, Carty filed his first *pro se* Motion to Dismiss for denial of his right to a speedy trial. Another *pro se* motion to dismiss was filed on July 26, 2007, and on July 27, 2007 an Emergency Motion for Pretrial Release was filed by Carty. On August 1, 2007, the trial court issued an Order scheduling the matter for a pretrial conference. On August 15, 2007, the People opposed Carty's Motion to Dismiss. Also, on August 15, 2007, another pre-trial conference was held, and the trial court heard arguments on the Motions to Consolidate and to Admit Prior Bad Acts. After hearing arguments from both parties, the trial court scheduled an evidentiary hearing for August 27, 2007, to determine the time of occurrence of each incident before making a final decision. The trial court also stated that all proposed *voir dire*, jury instructions and motions must be filed before August 27, 2007.

On August 24, 2007, the People filed a Motion to Withdraw its Motion to Consolidate or Join Offenses and sought to proceed with the murder trial. At the hearing on August 27, 2007, a letter was received by the trial court regarding the withdrawal of defense counsel. During the hearing the trial court ordered the People to file an additional brief regarding FRE 404(b) within one week, and the defendant would have ten days to

respond to the People's brief. Thereafter, on September 5, 2007, the People supplemented its Motion to Admit Prior Bad Acts by adding separate incidents involving two other individuals who were assaulted by Carty. The defense did not respond within ten days to the People's brief. On November 14, 2007, the trial court ordered the Defense to respond to the Motion to Admit Prior Bad Acts by November 21, 2007, and also to inform the trial court whether defense counsel would withdraw as counsel of record. On December 3, 2007, after the court-ordered deadline, defense counsel filed a motion seeking additional time to respond to the trial court's November 14, 2007 Order. On December 5, 2007, the trial court granted defense attorney's motion for additional time to respond to the trial court's November 14, 2007 Order. On December 10, 2007, defense counsel opposed the People's September 5, 2007 supplementary filing to admit prior bad acts and informed the trial court of her decision to withdraw as defense counsel of record.

On January 7, 2008, Carty filed a motion for release on house arrest. On May 22, 2008, Carty filed a motion asking the trial court to rule on his Motion for Release on House Arrest. On August 4, 2008, Carty again filed a Motion to Dismiss for violation of his Constitutional Right to a Speedy Trial. On August 8, 2008, Carty's counsel resurrected her request to withdraw as his counsel of record. In a Memorandum Opinion and Order dated August 12, 2008, the trial court granted the People's Motion under Rule 404(b) of the Federal Rules of Evidence to admit in the Blyden murder case prior bad acts concerning Carty's assault upon Stuart. On August 15, 2008, the People filed its Opposition to the Defendant's Motion to Dismiss. On September 11, 2008, the court issued an Order appointing new counsel for Carty.

At an October 1, 2008 status conference, the trial court denied the defense's motions to dismiss the charges against Carty, stating that there were appropriate motions being filed by the People regarding the evidence the People would seek to have admitted at trial. The trial court further reasoned that after receiving the motions the court had to conduct legal research and issue an opinion on the issues presented by the motions. Further, the trial court asserted that there was enmity between Carty and his counsel; therefore, the trial court had to resolve defense counsel's motions to withdraw. The trial court concluded that the delays occurring after the issuance of the Opinion were attributable to Carty. The

trial court informed the parties that it would schedule a date for trial but that the earliest date would be in January, 2009.

On January 5, 2009, the defendant again sought dismissal of the case for violation of his right to a speedy trial. In a status hearing on January 14, 2009, in which the trial court consolidated both cases, the trial court again denied Carty's Motion to Dismiss, asserting that it had to carefully consider the issue of consolidation of both cases. The trial court assumed blame for part of the delay and reasoned that it had to take some time to publish its Opinion. The trial court further noted that even if the cases were tried separately there would have been a delay. The trial court assured the parties at the January 14, 2009 status hearing that the case would be handled expeditiously and that jury selection would be scheduled for January 27, 2009. There were subsequent motions to amend the Information, and another pre-trial conference was held on February 25, 2009 regarding the amendments. The trial commenced on March 2, 2009.

■ With the above protracted procedural history, we now evaluate the issue of whether Carty's rights to a speedy trial were violated. The right to a speedy trial under the Sixth Amendment is applicable to the Virgin Islands Code through the Revised Organic Act. 48 U.S.C. § 1561; Revised Organic Act of 1954, § 3. Under the Sixth Amendment of the United States Constitution, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to a speedy and public trial . . . ." In the landmark case of *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), the United States Supreme Court established four factors that a trial court shall consider when deciding whether a defendant's speedy trial right has been violated. These factors include (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his rights; and (4) and prejudice to the defendant. *See also Brown v. People*, 55 V.I. 496, 503 (V.I. 2011). In weighing these factors, we must evaluate and scrutinize the conduct and actions of the trial court, Carty and the People and the role each played in causing the delay before trial. *Id.* at 530.

### 1. Length of Delay

■ Without some delay, there is no need for further inquiry into the remaining factors of the balancing test. *Id.; see also Doggett v. United States*, 505 U.S. 647, 652-53, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992). "If the delay is sufficiently long, courts assess the extent to which the

delay was long enough to 'intensify' the prejudice caused by the delay." *United States v. Battis*, 589 F.3d 673, 678 (3d Cir. 2009). The Third Circuit has held that a delay of fourteen months is sufficient to evaluate the remaining *Barker* factors. *Id.* Likewise, other circuits have held that a delay that exceeds one year has even been presumed to be sufficiently prejudicial to require evaluation of the three remaining factors. *United States v. Cardona*, 302 F.3d 494, 497 (5th Cir. 2002); *United States v. Watford*, 468 F.3d 891, 901 (6th Cir. 2001).

██ The length of delay is measured from the earlier period of the date of an arrest or an indictment. *Battis*, 589 F.3d at 678. Here, Carty was arrested on January 29, 2007 and his trial commenced on March 2, 2009. We conclude that the twenty-five month period between Carty's arrest and his trial constituted an unusual and interminable length of delay. Therefore, it is necessary for us to examine the remaining *Barker* factors to determine if Carty was prejudiced by the delay in the case before trial.

### 2. Reason for Delay

██ This case engendered fifteen pages of docket entry in the trial court. The record before us informs that approximately twenty-four (24) motions involving innumerable issues were filed which needed to be considered and decided prior to trial. The trial court held twelve (12) hearings prior to trial. The trial court was confronted with substantive discovery issues for resolution prior to trial. There were also several pre-trial conferences in an effort to resolve pre-trial discovery issues and the parties' contentious matters. All of these matters consumed an inordinate amount of time and caused significant delays. Importantly, this case involved a myriad of motions on substantive issues which the trial court had to resolve before trial and which were time consuming in deciding. The length of delay in this case was substantially characterized by lengthy pre-trial matters. Between Carty's arrest on January 29, 2007 and commencement of his trial on March 2, 2009, both the People and Carty inundated the trial court with pre-trial motions. Significantly, when motions were not being filed, the parties were awaiting the trial court's decision on previously filed motions.

Additionally, we cannot ignore the fact that one of the primary causes for delay was Carty's contentious relationships with his counsel. On August 8, 2008, Carty's former counsel, on behalf of the Territorial Public Defender's Office, filed a Motion to Withdraw as Court-Appointed

Counsel, for various reasons, including the fear for her safety (Motion to Withdraw as Court-Appointed Counsel, J.A. at 147, Aug. 8, 2008). This motion for defense counsel to withdraw was filed approximately eighteen months after Carty's arrest for the crimes in this case. Subsequently, on September 11, 2008, the trial court appointed another counsel to represent Carty. The change in defense counsel generated a significant delay of approximately six months, from September 11, 2008 to the date of trial on March 2, 2009. This delay is attributed to Carty, whose new counsel had to prepare and familiarize himself with two separate but consolidated cases.

We are mindful that the People's indecisiveness concerning whether it would request the trial court to consolidate the two cases caused some delay. Initially, the People filed a Motion to Consolidate Separate Cases or in the Alternative Motion for Joinder of Offenses on February 6, 2007. Subsequently, the People decided to file a Motion for the People to admit prior bad acts and withdrew its Motion to Consolidate the two cases on August 24, 2007. Eventually, the trial court partially granted the People's motion to admit prior bad acts with respect to Carty's assault upon Stuart at the Ital Booth. Thereafter, the trial court reverted to the original option and consolidated the cases.

Importantly, there is no evidence that the People caused any delay in scheduling the trial for the purpose of obtaining an unfair advantage in this case or in an effort to impede, obstruct, or hamper the defense in preparing or presenting its case. Considering the trial court's case docket, the evidence in the case, the number and seriousness of the charges, including first degree murder, the discovery to be conducted in the case, and further considering the pre-trial motions to be filed and decided, it was unrealistic to expect this case to be tried in less than four months after Carty's arrest which was when his first motion was filed asserting his rights to a speedy trial. Accordingly, the delay in this case occurred for numerous reasons with both parties and the trial court being blameworthy for the delay.

### 3. Defendant's Assertion of His Rights

"An assertion of [a defendant's right to a speedy trial] provides' evidence that the defendant was being deprived of his constitutional right since the more serious the deprivation, the more likely a defendant is to complain." *Battis*, 589 F.3d at 680 (alteration and internal quotation

marks omitted). A defendant shows that he has asserted his right to a trial (1) when he is represented by counsel and he can identify a motion or evidence of direct instructions to his counsel to assert that right at a time when a formal assertion of his rights would render some chance of success; or (2) if defendant is proceeding *pro se*, he is not required to make a procedurally perfect assertion of his right to a speedy trial; instead, he must make a reasonable assertion of his right to a speedy trial in a manner that would place authorities on notice of his claim. *Id.* at 681.

■ Carty filed several motions to dismiss for lack of a speedy trial - two of which were *pro se*. The crimes in the case occurred on January 28, 2007. Carty filed his first motion to dismiss asserting his constitutional right to a speedy trial on May 18, 2007, less than four months after his arrest and incarceration. Accordingly, we are mindful that Carty exercised due diligence in asserting his right to a speedy trial; therefore, we will weigh this factor in his favor.

### 4. Prejudice to the Defendant

■ With regard to the final *Barker* factor, the United States Supreme Court instructs:

> Prejudice, of course, should be assessed in the light of the interests of defendants whom the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown.

*Barker*, 407 U.S. at 532. The burden of proving prejudice lies with the defendant. *Hakeem v. Beyer*, 990 F.2d 750, 760 (3d Cir 1993).

■ Here, Carty has failed to meet his burden. Carty asserts that he was prejudiced by the delay of his trial because he was unable to personally visit the scene of the crime in order to locate witnesses to assist him with

367

his defense. Carty need not personally locate his witnesses. Through his appointed counsel, there was nothing preventing Carty from utilizing the services of an investigator, at the government's expense, to locate witnesses favorable to him. Importantly, the trial court's docket entries in this case informs that at an October 1, 2008 status hearing Carty's counsel reminded the trial court that Carty had a pending motion to appoint an investigator. On October 10, 2008, the trial court signed an order for the appointment of an investigator at government expense, to assist Carty's counsel in the preparation of his defense. Moreover, Carty was arrested in January of 2007. From that date until September 11, 2008, Carty was represented by the Office of the Territorial Public Defender, an office that employs a full-time investigator on its staff. Therefore, Carty had ample resources at his disposal for the purpose of locating favorable witnesses. Furthermore, Carty has not offered any evidence that any witness or potential witnesses favorable to him actually existed. *See United States v. Wright*, 343 F.3d 849, 860 (6th Cir. 2003) (claim that three-year delay prevented defendant from locating witnesses insufficient to show actual prejudice because defendant did not provide evidence that such witnesses existed). Additionally, Carty has not demonstrated that during the delay of the trial that any of his witnesses or potential witnesses died, became unavailable, or suffered from memory loss. *See United States v. Brown*, 498 F.3d 523, 528-29 (6th Cir. 2007) (claim that delay caused actual prejudice insufficient because defendant unable to show that lost testimony would have significantly aided defense); *United States v. Benson*, 487 F.2d 978, 985-86 (3d Cir. 1973) (claim that witness's memory faded due to 34-month delay insufficient to establish prejudice). Accordingly, we conclude that the trial delay did not cause prejudice to Carty's ability to secure witnesses favorable to him, if any existed, or to obtain evidence that could have changed the outcome of the case. Carty further asserts that he was assaulted by corrections officers during his pre-trial incarceration, but has not provided proof of any such incident. Unfortunately, Carty has failed to prove or to demonstrate how he was prejudiced by the delay of the trial in this case.

Balancing all the factors, this case entailed lengthy pre-trial motions and court proceedings. While the length of the delay and assertion of defendant's rights are two factors that weigh in favor of Carty, he, the People, and the trial court contributed to the reasons for the delay. Furthermore, in addressing Carty's Motions to Dismiss the trial

court took the blame for part of the delay and attributed it to taking time to respond to the motions dealing with evidentiary issues in the case. We also agree with the trial court that if the cases had not been consolidated, and taking into consideration docketing schedules and the processes of impaneling juries, Carty would have likely experienced much more delay in both cases coming to trial. Therefore, in reviewing the totality of the circumstances in this case, we conclude that Carty has failed to prove that he was prejudiced by the delay of the trial and that the verdicts would have been different without the delay.

## V. CONCLUSION

Carty's assertion that the trial court erred when it admitted charges against Carty for assaulting Stuart as a prior bad act under Rule 404(b) of the Federal Rules of Evidence became moot when the trial court consolidated the cases at the January 14, 2009 Status Conference Hearing. Additionally, we reject Carty's assertion that the trial court erred when it rejected the parties' request that the jury be provided with written instructions to take to the deliberation room because the decision to provide a jury with written instructions lies within the sound discretion of a trial court. We agree with Carty's assertion that the trial court erred when it permitted the People to introduce prejudicial testimony and a photograph of Blyden at his son's graduation. However, we conclude that the trial court committed harmless error because independent of the complained-of testimony and photograph, there was more than sufficient evidence, beyond a reasonable doubt, to convict Carty.

Finally, Carty posits a persuasive assertion that his Sixth Amendment Right to a Speedy Trial was violated because he was incarcerated for 25 months before he was afforded a jury trial. After a careful evaluation of Carty's claim, however, we conclude that the trial court did not violate Carty's Sixth Amendment Right to a Speedy Trial. Balancing the *Barker* factors, the length of delay was attributable to numerous factors, including a plethora of pre-trial motions filed by both parties. Clearly, this was not a case that was languishing on the trial court's docket for a number of years. Moreover, there was no lengthy period of judicial inactivity in the case, during the twenty-five months of Carty's pre-trial incarceration. Significantly, Carty has failed to prove how the length of the delay of the trial would have or could have caused prejudice to him and caused different results in the jury's verdicts. Therefore, we affirm Carty's convictions and the judgment of the Superior Court.