# JOSE VENTURA, Appellant/Defendant
## v.
# PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff

S. Ct. Criminal No. 2014-0021

Supreme Court of the Virgin Islands

May 4, 2016

590

594

RONALD D. WOOD, ESQ., The Wood Law Office, Show Low, AZ, *Attorney for Appellant.*

PAMELA R. TEPPER, ESQ., KIMBERLY L. SALISBURY, ESQ., Assistant Attorneys General, St. Thomas, USVI, *Attorneys for Appellee.*

HODGE, *Chief Justice*; SWAN, *Associate Justice*; and HODGE, *Designated Justice.*[1]

## OPINION OF THE COURT

(May 4, 2016)

HODGE, *Chief Justice.* Appellant Jose Ventura appeals from the Superior Court's July 25, 2014 judgment and commitment, which sentenced him to life imprisonment without the possibility of parole as punishment for his conviction of first-degree murder. For the reasons that follow, we affirm Ventura's conviction but remand the case to Superior Court so that it may consider Ventura's motion for a new trial in the first instance.

## I. STATEMENT OF RELEVANT FACTS AND PROCEDURAL POSTURE

Sometime around June 14, 2001, Virgin Islands Police Corporal Wendell Williams disappeared from the island of St. Croix. His sister reported him missing a week later, and the Virgin Islands Police Department ("VIPD") opened an investigation into his disappearance. They discovered that, although his time card at work was initially being punched on his behalf, he had stopped reporting to work and had not been in contact with either friends or family. His car was also discovered, abandoned and burned.

After allegations that the VIPD was handling the case improperly, the Federal Bureau of Investigation ("FBI") became involved in the investigation and learned that right before his disappearance, Williams had confronted two VIPD officers about not properly turning in a seized weapon. Not much else was learned until May 2002, when Theresa Coogle contacted the FBI and reported that she had witnessed Williams's murder in an abandoned building near the Grapetree Hotel area of St. Croix. The VIPD investigated the area, including an abandoned building

---

[1] Associate Justice Maria M. Cabret is recused from this matter. The Honorable Verne A. Hodge, a retired Presiding Judge of the Superior Court, sits in her place by designation pursuant to 4 V.I.C. § 24(a).

found on the property, but no forensic evidence connected to this case was discovered. Hardly any further investigation took place until some ten years later, when the VIPD created a Cold Case Unit, which began reinvestigating Williams's disappearance.

VIPD Detective Frankie Ortiz re-interviewed Coogle on June 15, 2011, and based on this subsequent interview, he returned to the Grapetree Hotel area for further investigation. He found a second abandoned building — near the abandoned building processed in 2002 — that matched Coogle's description.[2] This time, the VIPD, in conjunction with the FBI and an Evidence Recovery Team from Puerto Rico, carefully processed the second building and found items they considered evidence — including a broken blade, blood, and bullet indentations — of a potential murder scene as described by Coogle. The VIPD was unable to recover DNA evidence or fingerprints from the scene but based on this alleged newly recovered evidence, Detective Ortiz obtained a warrant for Ventura's arrest, along with four other people Coogle alleged were involved in the murder.

Ventura was arrested on February 13, 2012, and charged in a February 13, 2012 information — along with Jose Rivera, Maximiliano Velasquez III, Sharima Clercent, and Juan Velasquez — with having aided and abetted the murder in the first degree of Williams by shooting him with a firearm, in violation of 14 V.I.C. §§ 922(a)(1) and 11(a), and for having aided and abetted in the killing of Williams during the course of a kidnapping, or felony murder, in violation of 14 V.I.C. §§ 922(a)(2) and 11(a). Jury selection commenced on January 21, 2014, and ended two days later on January 23, 2014. The trial commenced on January 28, 2014.

Jaslene Williams, Williams's sister, testified at trial that she normally saw Williams two or three times a week, and that she reported him missing after he failed to visit her house or return her phone calls, and stopped retrieving her mail from their joint mailbox, as he usually did. She could not testify to the exact date of his disappearance but stated that she believed someone from the VIPD was responsible for Williams's disappearance, noting that another VIPD officer had been signing

---

[2] VIPD Detective George Felix testified that he assisted in processing "an old abandoned structure, somewhere in the bush," near the old Grapetree Bay Hotel in 2002. In 2012, he went back to the same grounds to process a second, smaller building that was located near the building he had processed in 2002. (J.A. 1969-70.)

Williams in for his shifts even though Williams had not been reporting for duty.

Coogle, who has two children with Ventura's co-defendant Maximiliano Velasquez, testified that one night in June 2001, she and Maximiliano[3] went out to dinner to celebrate their engagement. At the time, Coogle was seventeen years old and eight months pregnant with their second child. After dinner, Maximiliano dropped her off at her home and left. Later that night, he called her and asked her to pick him up on the north shore of St. Croix. Coogle drove out to the Grapetree Hotel area and parked the car once she saw Maximiliano standing on the side of the road. She then followed him on foot to a building. Inside the building, Coogle stated she saw a man stripped down to his underwear, on his knees, and with his hands bound behind his back and around a pole located in the middle of the room. She stated that the man had wire wrapped around his body and he was being electrocuted, using power from a generator since the building appeared to be abandoned and without electricity. She later recognized the man she saw bound in the abandoned building as Williams from news reports of his disappearance. Coogle then testified that Williams was shot in the hand and in the head:

A. I saw the officer get shot in his hand.

Q. Who shot him in the hand?

A. Jose Ventura.

Q. And did anything else happen to the officer?

A. Yes.

Q. What else happened to him?

A. I saw — I saw him get shot in his mouth.

Q. Do you recall who did that?

A. Yes.

Q. Who shot the officer in his mouth?

A. Your Honor, the person that shot him in his hand was . . . was Jose Rivera, the person that shot him in his mouth was Jose Ventura.

(J.A. 98.) Coogle stated she went outside the building and threw up, then went back into the building, where she saw Rivera cut William's ankle off

---

[3] In this case, there are multiple individuals with the same last names, so to minimize confusion we refer to them using their first names when appropriate.

with a John Deere saw. After the body was dismembered, it was put into garbage bags and Ventura and Rivera carried the bags towards the shoreline for disposal. Coogle admitted that she and Clercent cleaned up Williams's blood, under orders from Maximiliano. Coogle and Maximiliano then left the area.

Coogle, in her testimony, informed the jury that at a pretrial hearing held on January 27, 2014, she had confused the identities of Jose Ventura and Jose Rivera, and identified Ventura when asked to identify Rivera. She explained that she had confused Rivera with Ventura because they were both named Jose and she and the attorney had just been discussing Ventura. Coogle also acknowledged that she had given multiple statements to both federal and local law enforcement agencies, and that those statements were partly inconsistent with her court testimony.[4] She explained that it was likely that the agents confused the facts of Williams's murder with another homicide she had witnessed and had also discussed with the agents.

At the close of the People's evidence, Ventura moved for a judgment of acquittal, which the Superior Court granted only as to the felony murder charge.[5] Ventura did not call any witnesses in his defense, but his co-defendant, Rivera, did. Multiple witnesses for Rivera testified that Coogle could not have witnessed Williams's murder in mid-June 2001 because she was living and working in Miami, Florida during that time period, and travel to St. Croix would have been difficult due to her advanced pregnancy.

The jury returned a verdict on February 5, 2014, finding Ventura guilty of first-degree murder. The jury also found Rivera guilty, and Maximiliano not guilty, of first degree murder. *People v. Ventura*, No. SX-2012-cr-076, 2014 V.I. LEXIS 53, at *13 (V.I. Super. Ct. July 25, 2014) (unpublished). Ventura renewed his motion for judgment of acquittal, or in the alternative for a new trial, on February 21, 2014, which

---

[4] It appears that Coogle first spoke to the FBI and the VIPD on May 21, 2002. She gave the VIPD further statements in May and June of 2002. Two years later, she spoke with the FBI and the VIPD in May and June of 2004. But it was the statements she made in 2011 to the FBI and the VIPD that ultimately led to the VIPD's second search of the abandoned building in the Grapetree Hotel area of St. Croix.

[5] The Superior Court also dismissed the felony murder charges against Rivera and Maximiliano. It also dismissed all charges brought against Juan Velasquez and Sharima Clercent.

was denied. He was sentenced to life imprisonment without the possibility of parole on April 4, 2014, and the court's decision was memorialized in a July 25, 2014 judgment and commitment. Ventura timely filed a notice of appeal on April 7, 2014.[6]

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

Pursuant to the Revised Organic Act of 1954, this Court has appellate jurisdiction over "all appeals from the decisions of the courts of the Virgin Islands established by local law." 48 U.S.C. § 1613a(d); *see also* 4 V.I.C. § 32(a) (granting this Court jurisdiction over "all appeals arising from final judgments, final decrees or final orders of the Superior Court"). Because the Superior Court's July 25, 2014 judgment and commitment is a final order, this Court possesses jurisdiction over this appeal. *Codrington v. People*, 57 V.I. 176, 183 (V.I. 2012); *Williams v. People*, 55 V.I. 721, 727 (V.I. 2011).

This Court engages in a *de novo* review of the sufficiency of the evidence, viewing the evidence "in the light most favorable to the government." *Charles v. People*, 60 V.I. 823, 831 (V.I. 2014) (quoting *Stevens v. People*, 52 V.I. 294, 304 (V.I. 2009)); *Percival v. People*, 62 V.I. 477, 484 (V.I. 2015); *Cascen v. People*, 60 V.I. 392, 401 (V.I. 2014). When reviewing a denial of a motion for a new trial, this Court "will not interfere with the Superior Court's ruling absent an abuse of discretion." *Percival*, 62 V.I. at 490-91 (quoting *Stevens*, 52 V.I. at 304); *Joseph v. People*, 60 V.I. 338, 345 (V.I. 2013). But where the denial of a motion for a new trial is based on an application of a legal precept, our review is plenary. *Thomas v. People*, 60 V.I. 688, 693 (V.I. 2014); *Phillips v. People*, 51 V.I. 258, 280 (V.I. 2009). We also engage in plenary "review of all constitutional questions of law." *Carty v. People*, 56 V.I. 345, 354 (V.I. 2012).

---

[6] "A notice of appeal filed after the announcement of an order or judgment, but before the entry of a writing memorializing the same, is treated as filed on the date of and after such entry . . . and is considered timely filed." *Powell v. People*, 59 V.I. 444, 451 (V.I. 2013) (quoting *Potter v. People*, 56 V.I. 779, 787 n.10 (V.I. 2012) (internal quotation marks omitted)); V.I.S.Ct.R. 5(b)(1); *see Petric v. People*, 61 V.I. 401, 406 n.3 (V.I. 2014) (citing *Tyson v. People*, 59 V.I. 391, 399 n.5 (V.I. 2013)).

## B. Sufficiency of the Evidence

■ Ventura challenges the sufficiency of evidence presented by the People to support his first-degree murder conviction. When reviewing the Superior Court's denial of a motion of acquittal for lack of sufficient evidence, this Court must determine whether the People has proven beyond a reasonable doubt each element of the crime charged while "view[ing] the evidence in the light most favorable to the People." *Percival*, 62 V.I. at 484 (quoting *Webster v. People*, 60 V.I. 666, 678-79 (V.I. 2014)). Although strong deferential treatment is given to the finder of fact's determination that the evidence supports a conviction, "a verdict may not rest merely upon suspicion, speculation, or conjecture or any overly attenuated piling of inference on inference." *Todman v. People*, 59 V.I. 675, 681 (V.I. 2013) (citing *People v. Clarke*, 55 V.I. 473, 482 (V.I. 2011)).

■■ The third amended information charged Ventura as an aider and abettor to first degree murder. Aiding and abetting is governed by 14 V.I.C. § 11(a), which provides that "Whoever commits a crime or offense or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." Under an aiding and abetting theory, a finding of guilt may still be upheld although there is insufficient proof that the defendant "personally did every act constituting the offense alleged." *Freeman v. People*, 61 V.I. 537, 542 (V.I. 2014) (quoting *Nanton v. People*, 52 V.I. 466, 484 (V.I. 2009)); *Boston v. People*, 56 V.I. 634, 644 n.10 (V.I. 2012) (affirming conviction even though there was no evidence that defendant, as opposed to his friends, actually assaulted the victim). Thus, the People must prove beyond a reasonable doubt that Ventura either committed or aided and abetted in the "(1) unlawful[] kill[ing of] another, (2) with malice aforethought, and (3) in a willful, deliberate, and premeditated manner." *Codrington*, 57 V.I. at 184-85 (collecting cases). Malice aforethought "may be inferred from circumstances which show a wanton and depraved spirit, a mind bent on evil mischief without regard to its consequences. And 'where the killing is proved to have been accomplished with a deadly weapon, malice can be inferred from that fact alone.' " *Nicholas v. People*, 56 V.I. 718, 732 (V.I. 2012) (quoting *Gov't of the V.I. v. Sampson*, 94 F. Supp. 2d 639, 42 V.I. 247, 253 (D.V.I. App. Div. 2000)). Premeditation indicates the existence of a "design or plan to kill," which has been "reflected upon by

the accused and is committed in a cool state of the blood, not in sudden passion engendered by just cause of provocation." *Brown v. People*, 54 V.I. 496, 507 (V.I. 2010) (quoting *Gov't of the V.I. v. Martinez*, 780 F.2d 302, 305 (3rd Cir. 1985)). It "involves the mental process of thinking beforehand, deliberation, reflection, weighing, or reasoning *for a period of time, however short* [and] may be established by circumstantial evidence." *Nicholas*, 56 V.I. at 732 (citation and internal quotation marks omitted).

Ventura relies on the fact that Williams's body was never found as the basis for this Court to find reversible error. He argues that because the People never proved the *corpus delicti* of murder, meaning that it did not prove that Williams is dead and that his death was the result of some criminal conduct, there was insufficient evidence to adjudge him guilty. In making this argument, Ventura compares the facts of his case to those of *Gov't of the V.I. v. Harris*, 938 F.2d 401, 408 (3d Cir. 1991), in which the United States Court of Appeals for the Third Circuit required some further evidence of the *corpus delicti* beyond reliance on a defendant's confession alone, to find the defendant guilty. Ventura argues that the issue in this case is even more serious, where there is no confession and *only* the allegations of a single eyewitness, whose story has changed with each retelling. In short, Ventura asks this Court to hold that in a first-degree murder case where the body was never found, there must be some corroborating evidence of the crime to supplement a single witness's testimony.

As the Superior Court correctly noted, *corpus delicti* is defined as "the body or substance of the crime charged" and has two components "(1) an unlawful injury and (2) an individual's unlawful conduct as a source of that injury." *Ventura*, 2014 V.I. LEXIS 53 at *45 (citing *Harris*, 938 F.2d at 408). The *corpus delicti* rule — established over three hundred years ago in England — protects criminal defendants from unjust convictions resting on coerced confessions or confessions obtained due to mental illness by requiring some other proof that the crime had been committed. David A. Moran, *In Defense of the Corpus Delicti Rule*, 64 OHIO ST. L.J. 817, 817, 826-27 (2003) (citing 2 Matthew Hale, Pleas of the Crown 290 (1678) ("I would never convict any person of murder or manslaughter, unless the fact were proven to be done, or at least the body found dead."); *Harris*, 938 F.2d at 409 ("The major purpose of this rule is to prevent 'errors in conviction based upon untrue confessions alone.' " (quoting

*Warszower v. United States*, 312 U.S. 342, 347, 61 S. Ct. 603, 85 L. Ed. 876 (1941)). Most American jurisdictions have adopted the *corpus delicti* rule, but in recent years it has been questioned on the grounds that current constitutional confession protections — such as Fifth Amendment *Miranda* and Fourteenth Amendment due process rights — are sufficient to prevent coerced or unreliable confessions. Moran, 64 OHIO ST. L.J. at 818-19 (citing 1 MCCORMICK ON EVIDENCE § 145, at 563-64 (4th ed. 1992) (criticizing rule as ineffective and duplicative of other confession doctrines); Thomas A. Mullen, *Rule Without Reason: Requiring Independent Proof of the Corpus Delicti as a Condition of Admitting an Extrajudicial Confession*, 27 U.S.F. L. REV. 385, 418 (1993) (concluding that "[a]ll forms of the corpus delicti rule should be abolished, including the corroboration requirement"); *see State v. Aten*, 130 Wn.2d 640, 927 P.2d 210, 222 (1996) (noting that "the *corpus delicti* rule has been criticized by courts and legal commentators" and that many courts have adopted "the more relaxed [federal] rule that the independent corroborating evidence must only tend to establish the trustworthiness of the confession" but holding it was not among those courts).

■ We question the applicability of the *corpus delicti* rule to this case. Ventura did not confess to murdering Williams. Instead, an eyewitness produced the bulk of the evidence leading to Ventura's conviction. Thus, without a confession, we find the *corpus delicti* rule wholly irrelevant to this case. *Carrizales v. State*, 414 S.W.3d 737, 744 (Tex. Crim. App. 2013) (holding that in a case that "does not involve a defendant's extrajudicial confession, there is neither need nor purpose to refer to the *corpus-delicti* doctrine [which] is, at best, just short hand for 'evidence that the crime has been committed,' and, at worst, confusing.").

■ Instead, the People had a duty to prove beyond a reasonable doubt each element of first degree murder. *Codrington*, 57 V.I. at 184-85; *Brown*, 54 V.I. at 505; *see Carrizales*, 414 S.W.3d at 744 ("If the State proves each element beyond a reasonable doubt, there is no doubt that the crime has been committed by someone, namely the defendant."). The first element of first degree murder that the People must prove is that the defendant *unlawfully killed another* human being. *Codrington*, 57 V.I. at 184-85. This means that the People must prove that a person, in this case Williams, is dead and that his death was caused by some unlawful act.

■ Although we are not applying the *corpus delicti* rule to this case, we do find the *Harris* case instructive as to what must be proven in a murder

case where the body of the alleged victim has not been recovered. In *Harris*, the Third Circuit held that homicide cases require proof "that (1) a human being is dead (rather than simply disappeared, in those circumstances where no body has been produced, to ensure that the victim will not reappear alive and well at a later time); and (2) the death can be attributed to another's unlawful conduct (rather than by accident, suicide, or natural causes)." 938 F.2d at 408. It is not necessary for a body to be found in order to establish that an unlawful killing has occurred. *Id.* at 414 (citing Perkins, *The Corpus Delicti of Murder*, 48 VA. L. REV. 173, 179 (1962)); *Campbell v. State*, 500 N.E.2d 174, 179 (Ind. 1986) ("The production of the victim's body is not required in a murder prosecution if circumstantial evidence shows that death did occur." (citing *Stocking v. State*, 7 Ind. 259, 7 Ind. 326 (1855)); *Hurley v. State*, 60 Md. App. 539, 483 A.2d 1298, 1304 (1984) (collecting cases). The judicial system will not reward killers who successfully dispose of a victim's body with an acquittal where proof of guilt can be established through other means. *Harris*, 938 F.2d at 415 (citing *People v. Manson*, 71 Cal. App. 3d 1, 139 Cal. Rptr. 275, 298 (1977); *State v. Zarinsky*, 143 N.J. Super. 35, 362 A.2d 611, 621 (1976), *aff'd* 75 N.J. 101, 380 A.2d 685 (1977) (holding that the "successful concealment or destruction of the victim's body should not preclude prosecution of his or her killer where proof of guilt can be established beyond a reasonable doubt")). Thus, in murder cases where a body has not been found, the People must produce sufficient circumstantial evidence for the finder of fact to infer beyond a reasonable doubt that the alleged victim is, in fact, dead. Once the People have established that the individual is dead, it must then prove that the death was caused by an unlawful killing.

█ For example, in *State v. Thompson*, 73 Wn. App. 654, 870 P.2d 1022, 1028 (1994), the evidence established that the victim, known as a reliable and dependable person, disappeared after she had made several appointments for future dates, that she had not informed anyone of any travel plans, and that she left behind dirty dishes and her normally well-cared for cat without any food or water. The court held that the totality of these circumstances led to the "strong inference" that the victim had died "and that her death was sudden and caused by criminal means." *Id.* In *People v. Ruiz*, 44 Cal. 3d 589, 244 Cal. Rptr. 200, 749 P.2d 854, 864-65 (1988), the court held that the victim's "abrupt disappearance, her failure to contact friends, relatives, her physician and her pastor, her

failure to seek resumption of [government benefit] payments, and her abandonment of several personal effects, including her purse" was sufficient evidence to warrant the trier of fact to infer her death. *Tetso v. State*, 205 Md. App. 334, 45 A.3d 788, 824-25 (2012), the court held that the victim could be presumed dead based on the circumstantial evidence that she had been very close with friends and family but had not been heard from in years, that she suddenly disappeared leaving her beloved dogs at home, that her well-maintained vehicle was found abandoned in a parking lot, and that she had made plans to attend future events and parties. Importantly, the lack of a body helps to negate an inference of death by suicide or natural causes. *State v. Head*, 79 N.C. App. 1, 338 S.E.2d 908, 913-14 (1986). The common link throughout all of these cited cases is that a person who suddenly disappears, without notifying or contacting any friends or family and breaking well-established habits and future plans, leads to the strong inference that the individual has died, and that the death is likely the result of some criminal enterprise. Over thirty years ago the Supreme Court of Virginia recognized that

> Worldwide communication and travel today are so facile that a jury may properly take into account the unlikelihood that an absent person, in view of his health, habits, disposition, and personal relationships would voluntarily flee, "go underground," and remain out of touch with family and friends. The unlikelihood of such a voluntary disappearance is circumstantial evidence entitled to weight equal to that of bloodstains and concealment of evidence.

*Epperly v. Commonwealth*, 224 Va. 214, 294 S.E.2d 882, 890 (1982). We find this even truer today.

■ In this case, the People presented sufficient evidence that Williams is dead and that his death was likely caused by some criminal action. There is evidence that Williams disappeared unexpectedly and that he failed to maintain his habits, such as checking his mailbox and keeping in contact with friends and family, particularly his sister with whom he maintained a close relationship. *See Ex parte Bell*, 475 So. 2d 609, 616 (Ala. 1985) (holding that evidence that the victim had stopped his habit of supporting his family and visiting his parents and had not been seen or heard by anyone was sufficient to infer that the two shots fired by the defendant caused victim's death); *Campbell*, 500 N.E.2d at 179 (holding that where an eyewitness saw the victim beaten and held underwater, and

605

the victim had not been seen since the attack, there was sufficient proof of death by criminal means). In fact, no one has reported seeing or hearing from Williams since June 2001, almost fifteen years ago. He stopped reporting for work and his car was found abandoned and burnt. This evidence raises a strong inference that Williams suffered an unexpected death caused by some criminal means. When we take into consideration Coogle's testimony that she saw Williams being shot in the head with a firearm, it establishes sufficient proof to permit the finder of fact to conclude that Williams was unlawfully killed.

 Once the People have proven that someone unlawfully killed another human being, it must prove the identity of the perpetrator. In this case, the only evidence tying Ventura to Williams's murder is the testimony from a single eyewitness. Coogle testified that she witnessed Ventura fire a shot into the mouth of a bound, kneeling man, whom she later identified as Williams, and then cut up the body and dispose of the pieces. "[T]his Court has consistently held that the testimony of a single witness is sufficient to support a conviction, even if uncorroborated and contradicted by other testimony." *Estick v. People*, 62 V.I. 604, 612 n.2 (V.I. 2015) (collecting cases); *Brathwaite v. People*, 60 V.I. 419, 432 (V.I. 2014) ("Generally, the testimony of one witness is sufficient to prove any fact at trial, and a conviction can be sustained on the sole testimony of a single witness, even if there is testimony to the contrary." (citing *Francis v. People*, 57 V.I. 201, 211 (V.I. 2012))).

 The inconsistencies in Coogle's statements over the years call into question her credibility.[7] But ultimately, it was up to the jury to weigh

---

[7] During oral arguments, counsel for Ventura's co-defendant, Rivera, was questioned as to whether Coogle could be considered an accomplice and whether an accomplice instruction should have been given under 5 V.I.C. § 740. Where an accomplice testifies, § 740(4) provides that the trial court should instruct the jury that "[t]he testimony of an accomplice ought to be viewed with distrust." However, Rivera's counsel responded that Coogle was never considered an accomplice and that such an instruction was never requested. Video Archive of *Jose Rivera v. People*, SUPREME COURT OF THE UNITED STATES VIRGIN ISLANDS http://visupremecourt.org/Media_Services/Video_Archive/videodisplay.asp?VideoID=170at00:17:56 (last visited March 16, 2016). In light of the defendants' theory that Coogle was not located on St. Croix at the time of the murder — and therefore could not have been an accomplice — and that an accomplice instruction was not requested, the Superior Court did not err in not giving such an instruction. *See* 5 V.I.C. § 740 ("No party may assign as error the failure to give any such instruction unless he has requested the court to give it before the jury retires to consider its verdict.").

Coogle's credibility when deciding if there was proof beyond a reasonable doubt that Ventura shot and killed Williams or aided and abetted his murder. *Simmonds v. People*, 59 V.I. 480, 486 (V.I. 2013) (reviewing standard requires only that the evidence " 'establishes a case from which a jury could find the defendant guilty beyond a reasonable doubt' " and "need not be 'inconsistent with every conclusion save that of guilty' " (quoting *Mulley v. People*, 51 V.I. 404, 409 (V.I. 2009))); *see also People v. Manion*, 67 Ill. 2d 564, 367 N.E.2d 1313, 1320 (1977) (holding that even though it was difficult to believe the factual situation, it was up to the jury to weigh the eyewitness testimony and ascertain the truth). And despite the strong attack on Coogle's credibility, the jury still chose to believe her in-court testimony, as it was permitted to do. *See Billu v. People*, 57 V.I. 455, 466 (V.I. 2012) (holding that appellate review is "not a vehicle to relitigate credibility arguments that were unpersuasive to a jury"); *see also Hurley*, 483 A.2d at 1303-04 (upholding defendant's conviction of manslaughter where no body was found and the strongest evidence was the testimony of the victim's five-year-old daughter who heard a scream and saw the victim on the floor, coupled with testimony from various other people regarding the defendant's suspicious actions subsequent to the killing, such as giving his car an early morning wash to remove mud and giving the victim's car up for voluntary repossession).

Therefore, we conclude that because the jury could reasonably have believed Coogle's testimony, and her testimony established each element of first degree murder, the Superior Court correctly denied Ventura's motion for a judgment of acquittal. *See Tyson v. People*, 59 V.I. 391, 402-03 (V.I. 2013) (affirming conviction for first degree murder where premeditation could be found beyond a reasonable doubt from the period of time defendant spent arming himself with a firearm, pointing the gun at the victim, and firing the shots); *Phillip v. People*, 58 V.I. 569, 587 (V.I. 2013) (holding "the use of a deadly weapon against unarmed persons in the absence of any provocation is a fact that can weigh towards a finding of premeditation").

### C. Undue Pre-charging Delay

Ventura argues that his Fifth Amendment right to due process was violated by the People's ten-year delay in charging him with Williams's murder, given that Coogle identified him as a participant in the killing as

607

early as 2002. The Fifth Amendment of the United States Constitution — applicable in the Virgin Islands pursuant to section 3 of the Revised Organic Act, *Simmonds*, 59 V.I. at 491 (Congress intended for "the Fifth Amendment to have the same effect in the Virgin Islands as it does in the states") — "protects defendants against fundamentally unfair treatment by the government in criminal proceedings." *Doggett v. United States*, 505 U.S. 647, 666, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992). The United States Supreme Court discusses pre-indictment delay in two key cases: *United States v. Marion*, 404 U.S. 307, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971) and *United States v. Lovasco*, 431 U.S. 783, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977).

In *Marion*, the Court held that dismissal of a case is justified where a defendant suffers pre-indictment delay that substantially prejudices his right to a fair trial. 404 U.S. at 324; *see United States v. Jackson*, 446 F.3d 847, 849 (8th Cir. 2006). The Supreme Court advised that courts must engage in "a delicate judgment based on the circumstance of each case" to "accommodate the sound administration of justice." *Id.* at 325. But ultimately, the burden rests with the defendant to prove that he or she suffered substantial prejudice. *Lovasco*, 431 U.S. at 789.

Substantial prejudice alone is insufficient to support a Fifth Amendment violation. *Id.* (holding "proof of prejudice is generally a necessary but not sufficient element of a due process claim") (citing *Marion*, 404 U.S. at 324-25); *Commonwealth v. Scher*, 569 Pa. 284, 803 A.2d 1204, 1217 (2002) (holding "prejudice alone is not sufficient to show a violation of due process where the delay was due to the government's continuing investigation of the crime"). The reason for the government's delay must also be considered, and where it was an intentional delay to gain a tactical advantage or simply "reckless disregard of circumstances known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense," the court may find a Due Process violation. *Lovasco*, 431 U.S. at 795 n.17. It boils down to whether the government's delay in bringing charges "violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' and which define 'the community's sense of fair play and decency.' " *Id.* at 790 (citations omitted).

There is a split among jurisdictions as to what the second prong of the pre-indictment delay test should be, which has not yet been resolved by the United States Supreme Court. Michael J. Cleary, *Pre-Indictment Delay: Establishing A Fairer Approach Based on* United States v. Marion *and* United States v. Lovasco, 78 TEMP. L. REV. 1049, 1059 (2005); *see Hoo v. United States*, 484 U.S. 1035, 1036, 108 S. Ct. 742, 98 L. Ed. 2d 777 (1988) (White, J., dissenting) (discussing circuit split in dissent from denial of certiorari)); *United States v. Jakisa*, No. 14-CR-119 SRN/SER, 2015 U.S. Dist. LEXIS 52883, at *30 (D. Minn. Mar. 11, 2015). "A minority of federal circuits 'hold that the proper inquiry is to balance the prejudice to the defendant [from the pre-indictment delay] against the Government's justification for delay.' " *State v. Knickerbocker*, 152 N.H. 467, 880 A.2d 419, 422 (2005) (quoting *Hoo*, 484 U.S. at 1036) (White, J., dissenting). "The majority of federal circuits, on the other hand, 'require[ ] a showing of prosecutorial misconduct designed to obtain a tactical advantage over the defendant or to advance some other impermissible purpose in order to establish a due process violation' under the Fifth Amendment." *Id.*; *see Lovasco*, 431 U.S. at 795 n.16.

Because we believe that requiring the defendant to prove the reason behind the government's decision to delay charging him with a crime would be nearly impossible, rendering the rule defunct, *see Howell v. Barker*, 904 F.2d 889, 895 (4th Cir. 1990), we join the minority of jurisdictions and hold that once a defendant has proved substantial prejudice from the delay, the burden shifts to the People to explain the delay.[8] In *Doggett*, the United States Supreme Court stated that even where the prosecution's delay is due to mere negligence, it is not "automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him." 505 U.S. at 657. Although *Doggett* discusses a Sixth Amendment post-charging delay, we find this reasoning persuasive in the context of a pre-charging delay. The court, then, has a duty of balancing the prejudice the defendant suffered against the government's explanation, keeping in mind that those "fundamental conceptions of justice" and the "the community's sense of fair play and decency." *Lovasco*, 431 U.S. at 790.

---

[8] For a more detailed discussion on our decision to join the minority of jurisdictions and apply a balancing test, see the opinion in the companion case of *Rivera v. People*, 64 V.I. 570, slip op. at § II.D, issued of even date herewith.

 Ventura first asks this Court to hold that he is entitled to a presumption of prejudice due to the People's ten-year delay in charging him, and relies on *Doggett*. (Appellant's Br. 15.) The Court in *Doggett* held that an "8½-year lag between [a defendant's] indictment and arrest" is "extraordinary" and "clearly suffices to trigger the speedy trial enquiry." 505 U.S. at 652. We recently held that a post-information delay of one year is sufficient to raise a presumption of prejudice, requiring further evaluation of the reasons and consequences behind the post-charging delay. *Francis v. People*, 63 V.I. 724, 748 (V.I. 2015); *Doggett*, 505 U.S. at 652 n.1; *see Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). But we do not recognize the legal parallel between the presumed prejudice Ventura suffered from pre-information delay and a defendant's presumed prejudice resulting from a post-information delay. *See Jackson*, 446 F.3d at 852 ("*Doggett*, however, dealt with the presumption of prejudice in cases of post-accusation delay, which implicate[s] the Sixth Amendment speedy trial right, 505 U.S. at 652 n.1, a presumption that is not recognized in the Fifth Amendment due process analysis applicable here.").

 The Sixth Amendment strives to protect a person charged with a crime by minimizing the amount of time it takes to go to trial in order guard against "oppressive pretrial incarceration," to limit the stress and anxiety an impending trial causes, and to limit "the possibility that the defense will be impaired." *Francis*, 63 V.I. at 753 (citations and internal quotation marks omitted); *see Marion*, 404 U.S. at 320. In a Fifth Amendment analysis of pre-charging delay, by contrast, there is no need for concern regarding the length of a defendant's incarceration or his or her emotional well-being, as he or she has not yet been charged with a crime. It is true that both the Fifth and Sixth Amendments protect a defendant from the possibility of an impaired defense from the loss of evidence due to the passage of time. *Marion*, 404 U.S. at 324-26. And while we believe that such a lengthy pre-charging delay likely prejudices the defendant in some way, we do not accept the premise that such presumed prejudice necessarily meets the threshold for finding a constitutional violation. Indeed, in *Francis*, we held that "presumptive prejudice . . . is insufficient to prove a Sixth Amendment speedy trial

violation,"[9] without the defendant sufficiently showing "a particular prejudice impacting his ability to receive a fair trial." *Francis*, 63 V.I. at 754 (citing *Doggett*, 505 U.S. at 655). We find the same in the context of a Fifth Amendment Due Process violation and hold that a mere argument of presumed prejudice due to the passage of time, without more, is insufficient to support a constitutional violation.[10]

██ It is probable that Ventura suffered some prejudice to his defense given the lengthy amount of time between when the crime was committed and when he was arrested. However, Ventura has the burden of demonstrating substantial prejudice caused by the delay. As the United States Court of Appeals for the Fourth Circuit stated:

> This is a heavy burden because it requires not only that a defendant show actual prejudice, as opposed to mere speculative prejudice, but also that he show that any actual prejudice was *substantial* — that he was meaningfully impaired in his ability to defend against the state's charges to such an extent that the disposition of the criminal proceeding was likely affected.

*Jones v. Angelone*, 94 F.3d 900, 907 (4th Cir. 1996) (emphasis in original) (collecting cases). For example, actual prejudice may be shown through loss

---

[9] In a Sixth Amendment speedy trial violation analysis, a delay of at least one year before trial commences is *per se* sufficient to support a conclusion that the defendant has suffered some prejudice that requires the court to analyze the other three prongs of the *Barker* test. *Carty*, 56 V.I. at 365. The last prong of the *Barker* test still requires the defendant to prove the actual prejudice he suffered caused by the delay in order to substantiate his claim. *Francis*, 63 V.I. at 754-755.

[10] Generally, statutes of limitations "guard against possible as distinguished from actual prejudice resulting from the passage of time between crime and arrest or charge." *Marion*, 404 U.S. at 322. "Such statutes represent legislative assessments of relative interests of the State and the defendant in administering and receiving justice; they 'are made for the repose of society and the protection of those who may [during the limitation] . . . have lost their means of defence' " *Id.* (quoting *Public Schools v. Walker*, 76 U.S. 282, 9 Wall. 282, 288, 19 L. Ed. 576 (1870)); *Lovasco*, 431 U.S. at 789 ("statutes of limitations, which provide predictable, legislatively enacted limits on prosecutorial delay, provide 'the primary guarantee against bringing overly stale criminal charges.' " (quoting *Marion*, 404 U.S. at 322)). In the Virgin Islands, there is no statute of limitations for murder, 5 V.I.C. § 3541(a)(1), clearly evincing the Legislature's determination that it is within the public's interest to prosecute a suspected murderer even after a lengthy period of time has elapsed between the time the murder was committed and when charges are formally brought. Although there is no statute of limitations for murder, the Fifth Amendment still protects a defendant from substantial prejudice caused by the passage of time. *Marion*, 404 U.S. at 323.

— attributed to the delay — of specific witnesses or documents that would have provided information unavailable through other sources. *See, e.g., Carty*, 56 V.I. at 367-68 (finding no actual prejudice where defendant offered no evidence that a favorable witness actually existed); *Francis*, 63 V.I. at 754; *Jackson*, 446 F.3d at 851 (finding no actual prejudice where defendant's claim of deleted computer files did not specify with particularity the exculpatory nature of the files); *Jones*, 94 F.3d at 908.

But Ventura does not allege that a specific person or document is now unavailable. Instead, he alleges only that there may have been some potential exculpatory evidence that has been lost due to the delay, but he does not explain what evidence was lost or how it would have helped his case if it could have been produced. Speculation about possible lost evidence is insufficient to support a Fifth Amendment due process violation. *Jackson*, 446 F.3d at 851 ("Alleged prejudice is insufficient to establish a due process violation if it is insubstantial, speculative, or premature."); *State v. Glazebrook*, 282 Neb. 412, 803 N.W.2d 767, 778 (2011) (An allegation of a denial of due process "cannot rely on the real possibilities inherent in the delay, such as dimmed memories, inaccessible witnesses, and lost evidence. The defendant must show actual prejudice."). Ventura argues that he was actually and substantially prejudiced by the pre-information delay because the Virgin Islands Legislature adopted the Federal Rules of Evidence in April 2010, *Simmonds*, 59 V.I. at 498, thereby replacing the Uniform Rules of Evidence that governed criminal proceedings in the Virgin Islands at the time the alleged crime occurred. Had the case been brought sooner, he argues, Coogle's prior inconsistent statements could have been admitted to prove their substance.

We presume Ventura is referring to the Legislature's implicit repeal of 14 V.I.C. § 19, which permitted the admission of prior statements "for proving the truth of the matter asserted therein if it would have been admissible if made by the witness at the hearing or trial." *Woodrup v. People* 63 V.I. 696, 714-715 (V.I. 2015) (quoting 14 V.I.C. § 19). Under the Federal Rules of Evidence, Rule 801(d)(1)(A) permits only those pretrial statements made "under penalty of perjury at a trial, hearing, or other proceeding or in a deposition" to be admissible as substantive evidence. *Simmonds*, 59 V.I. at 495 (noting that in comparison to the former rule governing prior inconsistent statements, "Rule

801(d)(1)(A) sets forth significantly more stringent requirements for the admission of prior inconsistent statements as substantive evidence").

 Ventura is correct that under 14 V.I.C. § 19, Coogle's prior inconsistent statements may have been permitted as substantive evidence. However, "[r]ules of evidence are generally considered procedural, not substantive." *Phillips*, 51 V.I. at 275 (collecting cases) (superseded on other grounds by statute). They are applied "to administer every proceeding fairly, eliminate unjustifiable expense and delay, and promote the development of evidence law, to the end of ascertaining the truth and securing a just determination." FED. R. EVID. R. 102. While a change in a procedural rule, meaning a change in the process by which a case is adjudicated, may prejudice a defendant, it does not necessarily amount to a Constitutional violation. *See Burke v. People*, 60 V.I. 257, 268 (V.I. 2013) (rejecting defendant's argument in favor of a new trial "solely for the purpose of applying what he perceives to be the more favorable impeachment provisions applicable under the Federal Rules of Evidence" as opposed to those that governed under the Uniform Rules of Evidence); *Todmann v. People*, 57 V.I. 540, 544 (V.I. 2012) (holding that Supreme Court Rule 8(d) is a procedural rule that does not "create[] or alter[] substantive rights"); *Gov't of the V.I. v. Durant*, 49 V.I. 366, 373 (V.I. 2008) (holding that procedural rules "regulate[] . . . the judicial process for enforcing rights and duties recognized by substantive law" (quoting *Hanna v. Plumer*, 380 U.S. 460, 464, 85 S. Ct. 1136, 14 L. Ed. 2d 8 (1965))); *see also Collins v. Youngblood*, 497 U.S. 37, 45, 110 S. Ct. 2715, 111 L. Ed. 2d 30 (1990) (holding that generally, procedural changes "even though they work to the disadvantage of the accused, do not violate the Ex Post Facto Clause" (citing *Dobbert v. Florida*, 432 U.S. 282, 292-93, 97 S. Ct. 2290, 53 L. Ed. 2d 344 (1977)); *United States v. Fell*, 360 F.3d 135, 144 (2d Cir. 2004) (the Federal Rules of Evidence "do not set forth the constitutional parameters of admissible evidence, nor does a criminal defendant have a constitutional right to [them]"). Thus, the mere fact that rules of evidence changed in this jurisdiction between the time the crime was committed and the defendant went to trial does not automatically constitute actual prejudice. Ventura must show that the change actually hindered his ability to properly defend himself in violation of his right to due process.

Ventura does not explain how any one of Coogle's prior inconsistent statements could have helped his defense if it were admitted as

substantive evidence. He argues only that he was "left with no substantive evidence of what Coogle said before to prove that her story changed and that he was not involved." (Appellant's Br. 17.) But he does not highlight which of her prior statements indicated that he was not involved in the Williams's killing. In fact, our review of the record indicates that in one of Coogle's earliest statements to the authorities she identified Ventura as the individual who shot Williams in the head. And Ventura was not prohibited, under the current rules, from using her prior inconsistent statements to prove that her story had changed over the years, a fact Coogle addressed while testifying and which was delved into extensively during her cross-examination. *See Canton v. People*, 61 V.I. 511, 519 (V.I. 2014) (holding that the prior inconsistent statements would have been allowed for impeachment purposes under Federal Rule of Evidence 613); *Simmonds*, 59 V.I. at 502 n.12 (noting that "even under Rule 801(d)(1)(A), the [party attacking a witness] could have introduced [her] prior inconsistent statement for the limited purpose of impeachment").

We therefore conclude that Ventura has not proved he suffered from any substantial prejudice that has affected his right to a fair trial under the Fifth Amendment and thus, we need not examine why the government delayed as long as it did in bringing charges.

### D. New Trial

Finally, Ventura argues that the Superior Court abused its discretion in denying his motion for a new trial because there was no physical evidence establishing that he had committed any of the alleged crimes and the testimony of the only eyewitness was unbelievable. The Superior Court may "grant a new trial in 'the interest of justice' " pursuant to Superior Court Rule 135. *Percival*, 62 V.I. at 490-91; *Joseph*, 60 V.I. at 345; *Rivera-Moreno v. Gov't of the V.I.*, 61 V.I. 279, 320 (V.I. 2014) (new trial was warranted where the trial court empaneled a biased juror). We review the denial of a motion for a new trial for an abuse of discretion. *Percival*, 62 V.I. at 490-91; *Thomas*, 60 V.I. at 693.

The Superior Court never made a determination on the merits of Ventura's motion for a new trial and instead denied the motion based on a lack of subject-matter jurisdiction because the motion was filed one day past the filing deadline. The Superior Court concluded that when a motion for a new trial is "not based on newly discovered evidence, it 'shall be made within 10 days after [a] finding of guilty, or within such further time

as the court may fix during the 10-day period.' " *Ventura*, 2014 V.I. LEXIS 53 at \*52 (quoting SUPER. CT. R. 135). To determine whether the motion was filed out of time, the court then applied Superior Court Rule 9, which directs that when the deadline is less than eleven days, only business days, (excluding Saturdays, Sundays, and holidays) are considered as part of a 10-day deadline. Pursuant to the Superior Court's calculation, Ventura had until February 20, 2014, to file his motion for a new trial from the jury's guilty verdict returned on February 5, 2014. Ventura did not file his motion until February 21, 2014. After a detailed analysis, the Superior Court concluded that it was obligated to deny Ventura's motion due to untimeliness despite the fact that it "believe[s] that the ten-day deadline in Superior Court Rule 135 should be viewed as a claim-processing rule[.]" *Ventura*, 2014 V.I. LEXIS 53 at \*62.

The Superior Court recognized that this Court previously stated in *Joseph* that "Superior Court Rule 135 is 'unquestionably' a claims-processing rule and not jurisdictional" as part of a discussion as to whether the Superior Court is limited to the 10-day deadline on its own motion — a question we expressly declined to resolve at that time. *Ventura*, 2014 V.I. LEXIS 53 at \*57 (quoting *Joseph*, 60 V.I. at 347 n.7 ("the 10-day limitations period is unquestionably a non-jurisdictional claims processing rule")). The Superior Court then reasoned that because our evaluation of SUPER. CT. R. 135's 10-day deadline was merely "commentary constitut[ing] dicta" it could not follow our determination[11] in light of other binding case law. *Ventura*, 2014 V.I. LEXIS 53 at \*57 (citing *Todmann*, 57 V.I. at 547 n.6). It reached this conclusion by relying on our past precedent that "all canons of statutory interpretation apply when interpreting and construing rules of procedure[,]" *Ventura*, 2014 V.I. LEXIS 53 at \*58 (citing *Corrapse v. People*, 53 V.I. 470, 480-81 (V.I. 2010)), to hold that "borrowed rules, like borrowed statutes, must be construed to mean what the highest court of the jurisdiction from which they were taken construed them to mean before the rule was borrowed." *Ventura*, 2014 V.I. LEXIS 53 at \*60. Under this assessment, the court felt bound to follow pre-1955 decisions of the Supreme Court of the United States, which construed the 5-day time limit in Federal Rule of Criminal

---

[11] We fail to see how our determination that SUPER. CT. R. 135 is *"unquestionably* a non-jurisdictional claims processing rule" could be construed as anything but one of the holdings in *Joseph*, 60 V.I. at 347 n.7 (emphasis added).

Procedure 33[12] as a strict deadline that must be met. *Ventura*, 2014 V.I. LEXIS 53 at *60 (citing *United States v. Smith*, 331 U.S. 469, 474-76, 67 S. Ct. 1330, 91 L. Ed. 1610 (1947)).

We take this opportunity to expressly reject obligatory reliance on other courts' decisions when interpreting local court rules which have been addressed and determined by this court. As the Superior Court correctly recognized, borrowed rules are generally not construed the same as borrowed statutes and courts are not required to "incorporate the construction given them by the highest court of the jurisdiction from which they were borrowed." *Ventura*, 2014 V.I. LEXIS 53 at *56. This is because section 21(c) of the Revised Organic Act "vests the Virgin Islands Judiciary and the Virgin Islands Legislature with authority to promulgate procedural rules" — *In re Holcombe*, 63 V.I. 800, 825 (V.I. 2015); *Phillips*, 51 V.I. at 275) ("Congress granted both the Legislature and local courts the power to promulgate procedural rules.") — and we do not impose the same stringent rules of statutory interpretation on procedural rules that "regulate[] . . . the judicial process." *Durant*, 49 V.I. 366, 373 (V.I. 2008). Consequently, the Superior Court erred in adopting the United States Supreme Court's interpretation of FED. R. CRIM. P. 33 in *Smith*, 331 U.S. at 474-76, as binding precedent on how it must interpret Rule 135's 10-day time limit. Instead, it should have given greater weight to our decision in *Joseph*, in which we held that SUPER. CT. R. 135 is a claims processing rule. 60 V.I. at 347 n.7.

Therefore, the 10-day time limit set out in SUPER. CT. R. 135 "may be extended or waived, given that it is established solely by court rule." *Hughley v. Gov't of the V.I.*, 61 V.I. 323, 331 (V.I. 2014) (citing *Gov't of the V.I. v. Crooke*, 54 V.I. 237, 253-54 (V.I. 2010) ("It is well established that time limits set exclusively by court rules are mere claims-processing

---

[12] Superior Court Rule 135 was promulgated in 1955 and borrowed from the Federal Rules of Criminal Procedure Rule 33. *Compare* SUPER. CT. R. 135 *with* FED. R. CRIM. P. 33 (1946); *United States v. Smith*, 331 U.S. 469, 472, 67 S. Ct. 1330, 91 L. Ed. 1610 (1947) (quoting Rule 33 as it was in 1947). Although the language of the two rules today is significantly different, this Court has looked to other courts' interpretations of FED. R. CRIM. P. 33 when discussing SUPER. CT. R. 135 — *see, e.g., Stevens*, 52 V.I. at 304 (adopting the same standard of review as the federal courts for the denial of a motion for a new trial because the rules are so similar) — but we have explicitly held that FED. R. CRIM. P. 33 is inapplicable in the Virgin Islands courts, as Superior Court Rule 135 controls. *Joseph*, 60 V.I. at 345 ("Unquestionably, Superior Court Rule 135 applies to the exclusion of Federal Rule 33.")

rules which do not affect a court's subject-matter jurisdiction even if they may result in dismissal if violated.")). The purpose of claim-processing rules is to "assure relief to a party properly raising them, but do not compel the same result if the party forfeits them." *Eberhart v. United States*, 546 U.S. 12, 19, 126 S. Ct. 403, 163 L. Ed. 2d 14 (2005). When a party fails to raise a defense of untimeliness, thereby forfeiting that defense, a court should proceed to the merits of a case. *Id.* Here, the People admit that it did not object to the late filing of Ventura's motion for a new trial (Appellee's Br. 22 n.7), and the Superior Court should have proceeded to address the merits of the motion. When deciding a motion for a new trial, the Superior Court is uniquely situated to weigh the credibility of witnesses — as opposed to when deciding a motion for a judgment of acquittal — and it is this special function that necessitates a remand, especially in a case such as this where there is not an abundance of evidence indicating guilt and the credibility of a primary witnesses is, at best, questionable. *See Percival*, 62 V.I. at 490 (holding that where a motion for a new trial is "premised on a challenge to the credibility of the witnesses, 'it remains the law that a trial court should weigh the evidence' " (quoting *Stevens*, 52 V.I. at 306)); *Fahie*, 62 V.I. at 632 (holding that a new trial may be granted when the court "weigh[s] the evidence and the credibility of witnesses, and if the court determines that there has been a miscarriage of justice"). We therefore remand this case to the Superior Court so that it may consider the issue in the first instance.

## III. CONCLUSION

Accordingly, we affirm the Superior Court's denial of Ventura's motion to acquit his conviction for first degree murder for lack of sufficient evidence because Coogle testified that she saw Ventura shoot Williams, who was bound and kneeling, in the head, and that his body was then dismembered with a saw, placed in plastic bags, and brought down to the shoreline for disposal, all of which clearly constitutes first degree murder. The Court also correctly denied Ventura's motion to dismiss based on pre-indictment delay because he failed to show he was actually prejudiced in a way that impeded his defense. However, because the Superior Court incorrectly held that SUPER. CT. R. 135 prohibited it from considering Ventura's motion for a new trial, we remand the case so that the court can decide the issue in the first instance.